496 So.2d 116 (1986)
UNITED TELEPHONE COMPANY OF FLORIDA, Appellant,
v.
PUBLIC SERVICE COMMISSION, Appellee.
GENERAL TELEPHONE COMPANY OF FLORIDA, Appellant,
v.
PUBLIC SERVICE COMMISSION, Appellee.
Nos. 66673, 66633.
Supreme Court of Florida.
July 17, 1986.
Rehearing Denied November 14, 1986.
Jerry M. Johns, General Counsel, Altamonte Springs, for United Telephone Co. of Florida.
James V. Carideo, Leslie R. Stein, Lorin H. Albeck and Thomas R. Parker, Tampa, for General Telephone Co. of Florida.
William S. Bilenky, General Counsel and Sid J. White, Jr., Associate General Counsel, Tallahassee, for Florida Public Service Com'n.
William B. Barfield, Miami, and William H. Adams, III and Robert J. Winicki of Mahoney, Adams, Milam, Surface and Grimsley, Jacksonville, for Southern Bell Tel. & Tel. Co.
BARKETT, Justice.
These consolidated cases are before the Court on appeal from two orders of the Public Service Commission (PSC). We have jurisdiction. Art. V, § 3(b)(2), Fla. Const. The principal issue presented concerns the jurisdiction of the commission to modify revenue distribution contracts between telephone companies.
General Telephone Company of Florida (GTC), United Telephone Company of Florida (UTC), and Southern Bell are parties to a network of interrelated contractual agreements. The contracts delineate the manner in which the participating phone companies first pool, then distribute, the revenues from designated joint operations. The revenues in question are derived from charges assessed against long distance firms (such as AT & T, Sprint, MCI) when such firms utilize the equipment, facilities and personnel of the local exchange companies to originate or terminate long distance *117 calls.[1] These revenues are pooled, and Southern Bell administers the pool by agreement. The contracts at issue require that the distribution of the revenues back to Southern Bell, GTC and UTC is to be made based on investment and expenses determined in accordance with the Separations Manual which has been adopted by a rule of the Federal Communications Commission. This distribution provides that the companies first receive an amount equal to the toll-related expenses each company incurred in furnishing the service in question and then receive an appropriate portion of the remainder so that each participant obtains the same rate of return on its investment.
The Separations Manual has historically permitted the allocation of expenses associated with Customer Premises Equipment (CPE) to interstate and intrastate service. Consequently, these expenses have traditionally been recovered through the toll rates and distribution process described above. In reality, the total CPE expenses allocated are not all specifically related to the cost any telephone company incurs in providing long distance service. These expenses are deemed "illusory" by the PSC because they do not directly relate to long distance rate expenses, although they are legal expenses which were permissibly allocated in this fashion until January 1, 1983. In order to allow cost-based pricing as the telecommunications industry moves toward competition, the Federal Communications Commission, however, directed that all local exchange companies phase out their use of CPE expenses in setting interexchange access charges.[2] The phase-out, to be implemented over a five-year period which began on January 1, 1983, has been approved by the PSC. Both UTC and GTC are subject to the F.C.C. phase-out order.
Southern Bell, however, stands in a unique position. Judge H.H. Green, the judicial architect of the divestiture of AT & T, ordered the various Bell operating companies (including Southern Bell) to transfer all of their consumer premises equipment to AT & T effective January 1, 1984. United States v. American Telephone and Telegraph Co., 552 F. Supp. 131 (D.D.C. 1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). As of that date, Southern Bell has had no consumer premises equipment, and, therefore, no CPE expenses.
As a result of the transfer, Southern Bell allegedly anticipated a sharp revenue shortfall and petitioned the PSC to approve a rate increase. The commission denied the company's request but, instead, issued the order appealed herein, which allowed Southern Bell to withdraw CPE expenses from the pool despite the company's January 1984 transfer of all consumer premises equipment (and the concomitant expenses) to AT & T.
The commission advances a dual justification for its action. First, it notes that (prior to divestiture) Southern Bell's anticipated CPE related expenses were built into the rates charged the interexchange carriers. Thus, the pool contained the additional revenue resulting from inclusion of these anticipated Southern Bell CPE expenses. To preclude Southern Bell from recovering these "expenses" would result in a windfall to the other participating companies. Second, the commission, noting the allegation *118 of a shortfall by Southern Bell, permitted Southern Bell to withdraw this additional revenue from the pool to forestall the possibility that Southern Bell might be entitled to a local rate increase. The commission, understandably, was loath to pass on to the customers the cost of divestiture, and we are sympathetic to the commission's motives. The issue presented to us, however, is not whether the commission's solution was sound but whether the commission had jurisdiction to act at all under these circumstances.
We note preliminarily that "orders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made." General Telephone Co. v. Carter, 115 So.2d 554, 556 (Fla. 1959) (footnote omitted). See also Citizens v. Public Service Commission, 448 So.2d 1024, 1026 (Fla. 1984).
Such deference, however, cannot be accorded when the commission exceeds its authority. At the threshold, we must establish the grant of legislative authority to act since the commission derives its power solely from the legislature. See Florida Bridge Co. v. Bevis, 363 So.2d 799, 802 (Fla. 1978). As we said in Radio Telephone Communications, Inc. v. Southeastern Telephone Co., 170 So.2d 577, 582 (Fla. 1965):
[O]f course, the orders of the Florida Commission come to this court with a presumption of regularity, Sec. 364.20, Fla. Stat., F.S.A. But we cannot apply such presumption to support the exercise of jurisdiction where none has been granted by the Legislature. If there is a reasonable doubt as to the lawful existence of a particular power that is being exercised, the further exercise of the power should be arrested.
We are referred to three possible sources of jurisdiction  Sections 364.07(2), 364.055, and 364.14, Florida Statutes (1983).
The commission in its order concedes that it is not operating under section 364.07(2):
United and General argued that this Commission is without jurisdiction to authorize the removal of $9.7 million from the pools because we are limited by Section 364.07, Florida Statutes, to disapproving settlement contracts which are not in the public interest or resolving settlement disputes, neither of which are [sic] involved here.
We agree with that interpretation of what Section 364.07, Florida Statutes, states.
The parties concur with the commission that no dispute exists as to the manner of distribution under the contracts. Hence, although the parties discussed section 364.07(2), they agree that it is not applicable under these circumstances.
The only other mention of jurisdictional authority in the commission's order appears to imply that jurisdiction can be derived from the contracts themselves. After rejecting the applicability of section 364.07, the commission's order continues:
We agree with that interpretation of what Section 364.07, Florida Statutes, states. However, that argument is not germane because the settlement contracts themselves contemplate the course of conduct taken by the Commission.
It is true that the language of the contracts permits the commission to intervene. Parties to a contract, however, can never confer jurisdiction.
On appeal, the commission argues that it derives its jurisdiction in this case from sections 364.055 and 364.14. We can find no authority in either statute which permits the commission to interfere with a contract between private parties.
Section 364.055 concerns the commission's authority to set interim rates and is silent on the commission's power (or lack thereof) to modify contracts between telephone companies. This section cannot provide a basis for the commission's action.
*119 Section 364.14 empowers the commission to alter those telephone company rates, charges, or practices which it finds to be "unjust, unreasonable, unjustly discriminatory, [or] unduly preferential." We again fail to find jurisdictional support for the action taken. The statutory language embodied in section 364.14 is similar to that in section 206(a) of the Federal Power Act, 16 U.S.C. section 824(e) (1982). This provision authorizes the Federal Power Commission[3] to alter those utility company rates, charges, practices, or contracts which it finds to be "unjust, unreasonable, unduly discriminatory or preferential." In interpreting section 206(a), the federal courts have consistently held that the government is without authority to remedy discriminatory practices or contracts as between utility companies. See, e.g., Federal Power Commission v. Conway Corp., 426 U.S. 271, 276-77, 96 S.Ct. 1999, 2003-04, 48 L.Ed.2d 626 (1976). See also Sam Rayburn Dam Electric Cooperative v. Federal Power Commission, 515 F.2d 998, 1009 n. 48 (D.C. Cir.1975) (commission without authority to alter contract simply because contract was unprofitable to the utility that entered into it), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). The federal courts have interpreted their counterpart to Florida's section 364.14 as only empowering federal regulatory commissions to alter those practices which are unjust, unreasonable or discriminatory as applied to ratepayers. See, e.g., Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956) (section 206(a) is designed to give commission power to protect the public interest, not to protect the economic interests of utility companies); Metropolitan Edison Co. v. Federal Energy Regulatory Commission, 595 F.2d 851, 855 (D.C. Cir.1979) (regulatory authority to correct "unjust, unreasonable, unduly discriminatory or preferential" practices extends only to those practices unjust in reference to the public, i.e., the ratepayers, not utility companies).
The federal courts' interpretation of section 206(a) is based on more than the statutory language. It is based on established constitutional law as well. In Arkansas Natural Gas Co. v. Arkansas Railroad Commission, 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705 (1923), the Supreme Court held that a state regulatory agency could not modify or abrogate private contracts unless such action was necessary to protect the public interest. To modify private contracts in the absence of such public necessity constitutes a violation of the impairment of contracts clause of the United States Constitution. Id. at 382-83, 43 S.Ct. at 388. See also Sierra Pacific, 462 U.S. at 355, 76 S.Ct. at 372; Agricultural Products Corp. v. Utah Power & Light Co., 98 Idaho 23, 28-29, 557 P.2d 617, 622-23 (1976); High Plains Natural Gas Co. v. Railroad Commission of Texas, 467 S.W.2d 532, 537 (Tex.Civ.App. 1971).
We find persuasive the interpretation placed upon the federal counterpart to Florida's section 364.14. We hold that section 364.055 and section 364.14 refer to rates and practices as applied to ratepayers and do not confer jurisdiction upon the commission to alter the contractual relationship between telephone companies.
Accordingly, we quash the orders of the commission insofar as they permit Southern Bell to withdraw $9.7 million from the intrastate toll pool and the intrastate access charge pool, and direct the commission to order Southern Bell to return all money (plus interest) collected pursuant to the orders under review.
It is so ordered.
McDONALD, C.J., and ADKINS, OVERTON and EHRLICH, JJ., concur.
SHAW, J., concurs specially with an opinion.
BOYD, J., dissents.
*120 SHAW, Justice, specially concurring.
I agree with the majority that under these circumstances the Public Service Commission (PSC) does not have jurisdiction to interfere with the contract and relationship between Southern Bell, General Telephone Company of Florida (GTC) and United Telephone Company of Florida (UTC). In my view, however, this does not mean that PSC is without authority over the $19.8 million in dispute here. The parties agree that all of Southern Bell's Customer Premises Equipment (CPE) was turned over to American Telephone and Telegraph Company (AT & T) effective 1 January 1984 as part of the federal divestment settlement. Thus, the $19.8 million in CPE expenses imputed to Southern Bell and credited to the pool under the contract was a phantom expense. Of this $19.8 million, Southern Bell received $10.1 million, with GTC and UTC sharing the remaining $9.7 million under the contract. Public Service Commission is correct in characterizing the $9.7 million as an unearned windfall for GTC and UTC but should have gone further  the entire $19.8 million is an unearned windfall and none of the companies are entitled to claim phantom CPE expenses. The entire sum of $19.8 million should be treated as windfall profits in setting the companies' rates.
NOTES
[1] Southern Bell, GTC and UTC will be referred to herein as "local exchange companies"; the long distance firms such as MCI and AT & T will be referred to as "interexchange carriers."
[2] The FCC rulemaking proceeding which resulted in the phase out is commonly referred to as Computer II. The specific orders which together comprise the Computer II decision are: Final Decision, In re Amendment of Section 64.702 of the Commission's Rules and Regulations, 77 F.C.C.2d 384 (1980); Memorandum Opinion and Order, In re Amendment of Section 64.702 of the Commission's Rules and Regulations, 84 F.C.C.2d 50 (1980); Memorandum Opinion and Order on Further Reconsideration, In re Amendment of Section 64.702 of the Commission's Rules and Regulations, 88 F.C.C.2d 512 (1981). The F.C.C.'s unified Computer II decision was affirmed in its entirety in Computer and Communications Industry Association v. F.C.C., 693 F.2d 198 (D.C. Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).
[3] The Federal Power Commission was terminated and its authority transferred to the Federal Energy Regulatory Commission by sections 7172(a)(1) and 7293 of title 42 (1982).