# Supreme Court of Florida

_____

No. SC17-82
_____

**SIERRA CLUB,**
Appellant,

vs.

**JULIE IMANUEL BROWN, etc., et al.,**
Appellees.

[May 17, 2018]

LEWIS, J.

This case is before the Court on appeal from a decision of the Florida Public Service Commission (the Commission), relating to the rates or service of a public utility providing electric service.[1]  Specifically, Sierra Club, Appellant, challenges the Commission's decision in _In re Petition for Rate Increase by Florida Power & Light Co._, Order No. PSC-16-0560-AS-EI, 2016 WL 7335779 (Fla. P.S.C. Dec. 15, 2016) (the Final Order), which approved a nonunanimous settlement agreement

_____

1.  Various quotations below refer to the Commission as the PSC.

between certain parties.[2]  We have jurisdiction.  *See* art. V, § 3(b)(2), Fla. Const.; § 366.10, Fla. Stat. (2017).  For the following reasons, we hold that the Commission applied the appropriate standard of review in the Final Order, and competent, substantial evidence supports that decision.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2016, FPL made three filings with the Commission: (1) a petition for a base rate increase and a limited-scope adjustment (the Rate Petition); (2) depreciation and dismantlement studies; and (3) a petition for approval of FPL's storm-hardening plan.  One month later, FPL filed a petition to modify and continue its asset optimization incentive mechanism.  In May 2016, the Commission consolidated these four dockets for discovery and hearing (collectively the Rate Case).  After adjustments, FPL revised its request in the Rate Petition to the following: (1) an increase in rates and charges sufficient to generate additional total revenues of $826 million in 2017; (2) a subsequent revenue increase of $270 million in 2018; and (3) a $209 million limited-scope adjustment for the Okeechobee Clean Energy Center effective on its commercial in-service date, which was scheduled for 2019.  In the Rate Petition, FPL requested a rate of

2. The Commission, Florida Power & Light (FPL), and the Office of Public Counsel (OPC) are the Appellees.  The City of South Miami and League of Women Voters of Florida submitted amicus curiae briefs.

return on equity (ROE) within a range of 10.5 to 12.5 percent, with a midpoint of 11.5 percent.

Nine intervenors, including Sierra Club, participated in the Rate Case.[3] After discovery, the Commission held an evidentiary hearing from August 22 to September 1, 2016 (the August Hearing). In total, the Commission identified 167 issues in its prehearing order to be addressed at the August Hearing. On appeal, Sierra Club only challenges one of those issues—was "FPL's replacement of its peaking units reasonable and prudent?" During the August Hearing, thirty-five witnesses testified and over 800 exhibits were entered into evidence.

Through the Rate Case, FPL sought to recover costs for its Peaker Replacement Project (the Peaker Project). Sierra Club intervened to challenge the prudence of the Peaker Project, arguing that it was unreasonable, unnecessary, and more expensive than renewable alternatives. The Peaker Project, which FPL had completed in 2016, consisted of replacing forty-four of FPL's forty-eight gas turbine (GT) peaking units with seven combustion turbine (CT) peaking units. As a result, FPL replaced smaller 1970s vintage GTs with newer, larger, and more

_____

3. The other intervenors follow: OPC, South Florida Hospital and Healthcare Association (SFHHA), Florida Retail Federation (FRF), Wal-Mart Stores East, LP, and Sam's East, Inc. (Walmart), Federal Executive Agencies (FEA), Florida Industrial Power Users Group (FIPUG), American Association of Retired Persons (AARP), and Daniel and Alexandria Larson (the Larsons).

fuel-efficient CTs.  Both the GTs and CTs run on natural gas.[4]  The CTs require

auxiliary power for starting purposes and FPL retained four GTs for the black-start

capability.  The engines of the replaced GTs were originally designed in

approximately 1958 for Boeing aircraft.  Correspondingly, manufacturers no

longer fabricate these types of units; thus replacement parts for the GTs are

difficult to obtain.  On one occasion, when a GT torque converter failed, FPL was

forced to simply retire the unit rather than employ a manufacturer to reverse

engineer the replacement part due to the high cost and twelve-month lead time.

Peakers are actually "reliability units," serving two important functions for

FPL: meeting heightened customer demand and providing power when a utility

loses base load generation.  FPL deploys its peakers during peak demand—the

single hour of highest energy usage per day each year.[5]  Yet meeting peak demand

is not the only function of peakers.  FPL also utilizes these units outside of summer

and winter peak demand periods during emergencies such as extreme weather,

unusual demand, or equipment failures.  Importantly, peakers must be brought

---

4.  The CTs are technically dual fuel, meaning that they can run on oil if it is cost-effective.

5.  Unsurprisingly, summer peak in Florida typically occurs between 4 and 5 p.m. in August; also, there is a winter peak that usually takes place between 6 and 7 a.m.

online quickly—within fifteen or thirty minutes. For these reasons, FPL cannot use solar power for its peaking units.

The total cost of the Peaker Project was $725.6 million. Of the Rate Petition's 2017 revenue request, the Peaker Project accounted for $92 million of that rate increase. Nevertheless, according to FPL estimates, the Peaker Project will result in $203 million in net customer savings, partly due to the CTs' lower emissions and better heat rate.

Throughout the Rate Case, several parties continued to explore the possibility of a settlement. On October 6, 2016, FPL and three intervenors—OPC, SFHHA, and FRF (collectively the Signatories)—executed a settlement agreement. This settlement resolved all outstanding issues in the Rate Case, including the issue related to the prudence of the Peaker Project. FIPUG took no position on the settlement; Walmart and FEA did not oppose it. Conversely, Sierra Club, AARP, and the Larsons opposed the settlement agreement.

In the settlement agreement, FPL made various concessions from its revised Rate Petition: (1) a 2017 revenue increase of $400 million (down from $826 million); (2) a 2018 revenue increase of $211 million (down from $270 million); and (3) a $200 million limited-scope adjustment effective on the in-service date of the Okeechobee unit (down from $209 million). Further, the ROE midpoint was set at 10.55 percent within a 9.6 to 11.6 percent range (down from an 11.5 percent

midpoint within a 10.5 to 12.5 percent range). In total, the settlement agreement represented a total revenue increase of about $2 billion less than FPL's original Rate Petition. Finally, the minimum term of the settlement agreement runs from January 1, 2017, until December 31, 2020.

The settlement agreement covered additional terms that are not directly relevant in this case. Two of the terms concerned renewable energy: (1) the authorization for FPL to construct up to 1200 megawatts (MW) of solar power generation by the end of 2021 with costs recoverable upon the unit in-service date if they are cost-effective through the Solar Base Rate Adjustment (SoBRA); and (2) the requirement that FPL implement a fifty MW battery storage pilot program with no cost-effective restriction. The settlement agreement was in the form of a "black box" resolution; thus the parties agreed on the total cost of service, but did not specifically assign amounts to line items or costs.

After the parties filed the settlement agreement, the Commission reopened the record, affording an opportunity for participants to provide supplemental testimony and exhibits, conduct discovery, and address the terms of the settlement agreement not discussed at the August Hearing. Thus the Commission scheduled another hearing for October 27, 2016 (the October Hearing). The Commission determined that the "sole issue to be decided in this hearing [wa]s whether the

Settlement Agreement dated October 6, 2016, is in the public interest and should be approved."

At the October Hearing, five witnesses testified. Subsequently, the Commission reconvened to consider the settlement agreement. After deliberation, the Commission unanimously approved the settlement agreement in its entirety. The Commission later memorialized its findings and conclusions in the Final Order. Specifically, the Commission stated that its "standard for approval of a settlement agreement is whether it is in the public interest." The Commission found "that taken as a whole the settlement provides a reasonable resolution of all the issues raised in the consolidated dockets." Finally, it found "that the Settlement Agreement establishes rates that are fair, just, and reasonable and is in the public interest."

This appeal follows.

**ANALYSIS**

Principally, this dispute centers upon whether the Commission properly applied its public interest standard in considering and approving the settlement. Sierra Club contends that it was necessary to independently apply a prudence standard to the Peaker Project individually; whereas, the Commission asserts that it correctly applied its public interest standard to the settlement agreement as a whole. As demonstrated below, we agree with the Commission.

## Our Standard of Review

"[W]hen reviewing an order of the Commission, this Court affords great deference to the Commission's findings." *Citizens of State v. Fla. Pub. Serv. Comm'n* (*Citizens I*), 146 So. 3d 1143, 1149 (Fla. 2014). "Commission orders come to this Court clothed with the presumption that they are reasonable and just." *W. Fla. Elec. Coop. Ass'n v. Jacobs*, 887 So. 2d 1200, 1204 (Fla. 2004). "To overcome these presumptions, a party challenging an order of the Commission on appeal has the burden [to] show[] a departure from the essential requirements of law and the legislation controlling the issue, or that the findings of the Commission are not supported by competent, substantial evidence." *Crist v. Jaber*, 908 So. 2d 426, 430 (Fla. 2005). "We will not overturn an order of the PSC because we would have arrived at a different result had we made the initial decision and we will not reweigh the evidence." *Gulf Power Co. v. Fla. Pub. Serv. Comm'n*, 453 So. 2d 799, 803 (Fla. 1984).

Although the Commission is afforded leeway in its proceedings, deference cannot be accorded if the Commission exceeds its authority. *United Tel. Co. of Fla. v. Fla. Pub. Serv. Comm'n*, 496 So. 2d 116, 118 (Fla. 1986). As the threshold issue, we must first establish the grant of legislative authority to act since the Commission derives its power solely from the Legislature. *Id.* Therefore, "[w]hether the PSC has the authority to act is a question of law, which is subject to

de novo review." *Citizens of State v. Graham* (*Citizens II*), 191 So. 3d 897, 900 (Fla. 2016); *see also* § 120.68(7)(d), Fla. Stat. (2017). This issue involves the Commission interpreting section 366.06(1), Florida Statutes (2017), which it is tasked with enforcing; therefore, its interpretation "is entitled to great deference and will be approved by this Court unless it is clearly erroneous." *BellSouth Telecomm., Inc. v. Johnson*, 708 So. 2d 594, 596 (Fla. 1998).[6]

**The Commission's Appropriate Standard**

Pursuant to section 366.06(1), Florida Statutes, the Commission "shall have the authority to determine and fix fair, just, and reasonable rates that may be requested . . . by any public utility for its service." *Id.* § 366.06(1). As part of these base rate cases, utilities may seek to recover costs for capital investments in power-generating facilities. *See Citizens of State v. Graham* (*FPUC*), 213 So. 3d 703, 716-17 (Fla. 2017); *Citizens II*, 191 So. 3d at 900-01; *Citizens of State v. Fla. Pub. Serv. Comm'n*, 435 So. 2d 784, 785 (Fla. 1983). Section 366.06 details the Commission's procedures for ratemaking, and it expressly contemplates cost recovery for utility investments:

> The [C]ommission shall investigate and determine the actual legitimate costs of the property of each utility company, actually used and useful in the public service, and shall keep a current record of the net investment of each public utility company in such property which

6. Section 366.06 has not been amended since 1995; thus at all relevant times the statutory language has been consistent.

- 9 -

value, as determined by the [C]ommission, shall be used for ratemaking purposes and shall be the money honestly and prudently invested by the public utility company in such property used and useful in serving the public, less accrued depreciation . . . .

§ 366.06(1), Fla. Stat. It is from this statute that the Commission derives its prudence standard, which it applies to ensure that the recovered costs result from prudent investments. *See S. All. for Clean Energy v. Graham* (*SACE*), 113 So. 3d 742, 749-50 (Fla. 2013); *Fla. Power & Light v. Beard*, 626 So. 2d 660, 662 (Fla. 1993). Within a rate case, the Commission applies this prudence standard to the individual investment projects for which a utility is seeking cost recovery. *See Beard*, 636 So. 2d at 662; *Shevin v. Yarborough*, 274 So. 2d 505, 509-10 (Fla. 1973). Here the Commission acknowledges that it would have been proper to apply the prudence standard to the Peaker Project in an independent determination of the individual issue in the absence of the settlement agreement.

When presented with a settlement agreement, however, the Commission's review shifts to the public interest standard: whether the agreement—as a whole—resolved all the issues, "established rates that were just, reasonable, and fair, and that the agreement is in the public interest." *Citizens I*, 146 So. 3d at 1164; *see also Gulf Coast Elec. Coop., Inc. v. Johnson*, 727 So. 2d 259, 264 (Fla. 1999) ("[I]n the final analysis, the public interest is the ultimate measuring stick to guide the PSC in its decisions."); *AmeriSteel Corp. v. Clark*, 691 So. 2d 473, 478 (Fla. 1997) ("[T]he Commission's charge in proceedings concerning territorial

- 10 -

[settlement] agreements is to approve those" that are not against the public interest, among other factors.); *Utilities Comm'n of City of New Smyrna Beach v. Fla. Pub. Serv. Comm'n*, 469 So. 2d 731, 732 (Fla. 1985) ("We do not relegate the PSC to a 'rubber stamp' role in approving territorial [settlement] agreements. The PSC has the responsibility to ensure that the territorial [settlement] agreement works no detriment to the public interest."). The Commission regularly and consistently applies its public interest standard when reviewing settlement agreements. *E.g.*, *In re Petition for Rate Increase by Gulf Power Co.*, Order No. PSC-17-0178-S-EI, 2017 WL 2212158, at *6 (Fla. P.S.C. May 16, 2017); *In re Application for Rate Increase by Fla. Pub. Utilities Co.*, Order No. PSC-14-0517-S-EI, 2014 WL 4960917, at *1 (Fla. P.S.C. Sept. 29, 2014); *In re Petition for Increase in Rates by Fla. Power & Light Co.*, Order No. PSC-13-0023-S-EI, 2013 WL 209584, at *7 (Fla. P.S.C. Jan. 14, 2013); *In re Application for Increase in Wastewater Rates in Lee Cty. by Utilities, Inc. of Eagle Ridge*, Order No. PSC-12-0346-FOF-SU, 2012 WL 2704935, at *3 (Fla. P.S.C. July 5, 2012); *In re Petition for Increase in Rates by Fla. Power & Light Co.*, Order No. PSC-11-0089-S-EI at 6, 2011 WL 344916 (Fla. P.S.C. Feb. 1, 2011); *In re Petition for Increase in Rates by Progress Energy Fla., Inc.*, Order No. PSC-10-0398-S-EI at 6, 2010 WL 2542531 (Fla. P.S.C. June 18, 2010); *In re Petition for Rate Increase by Progress Energy Fla., Inc.*, Order

No. PSC-05-0945-S-EI at 6, 2005 WL 2416368 (Fla. P.S.C. Sept. 28, 2005). In the past, we have approved of the Commission's public interest standard:

> Ultimately, the Commission's actions are conditioned by statute (rates set must be fair, just, and reasonable) and its actions are subject to judicial review—the Commission cannot simply accept any settlement agreement devoid of record support as in the public interest.

*Citizens I*, 146 So. 3d at 1153.

In *Citizens I*, we affirmed a Commission determination that a nonunanimous settlement agreement—as a whole—was in the public interest. *Id.* at 1153-54, 1164-65. Despite OPC's objection, this Court approved that settlement, in part, because section 120.57(4), Florida Statutes, authorizes "informal disposition of the rate proceeding . . . by stipulation, agreed settlement, or consent order '[u]nless precluded by law.' " *Citizens I*, 146 So. 3d at 1150 (second alteration in original) (quoting § 120.57(4), Fla. Stat. (2012)). As we noted in *Citizens I*, " '[t]he legal system favors the settlement of disputes by mutual agreement between the contending parties' and '[t]his general rule applies with equal force in utility service agreements.' Nothing in our precedent or the language of the statute suggests that this general rule does not also apply in rate-setting cases." 146 So. 3d at 1155 (citation omitted) (quoting *AmeriSteel*, 691 So. 2d at 478). Nothing precluded the parties from settling there; thus because competent, substantial evidence supported the Commission's finding that the settlement agreement

- 12 -

"established rates that were just, reasonable, and fair, and that the agreement [wa]s in the public interest," we affirmed. *Id.* at 1153-54, 1164, 1173.

Chapter 366, Florida Statutes, does not separately prescribe a Commission standard for reviewing settlement agreements in rate cases. The public interest, however, has been the declared legislative goal of chapter 366 since its inception in 1951:

> Legislative Declaration.—The regulation of public utilities as defined herein is declared to be in the public interest and this chapter shall be deemed to be an exercise of the police power of the state for the protection of the public welfare and all the provisions hereof shall be liberally construed for the accomplishment of that purpose.

§ 366.01, Fla. Stat. (2017) (maintaining the original statute's language verbatim); *see* ch. 26545, Laws of Fla. (1951). This Court has stated that the "determination of what is in the public interest rests exclusively with the Commission." *Citizens I*, 146 So. 3d at 1173. Further, the Commission regularly and consistently applies its public interest standard when it reviews settlement agreements. *See supra* p. 11 (collecting orders). Finally, we recently affirmed a Commission-approved settlement agreement under the same standard in *Citizens I*. 146 So. 3d at 1153-54, 1164-65. It follows that the Commission's standard for reviewing settlement agreements is the public interest standard; and it is neither a departure from the essential requirements of law nor a usurpation of legislative authority for the Commission to invoke its proper standard when no law precludes settlement. *See*

- 13 -

*id.* at 1055.  Accordingly, the Commission correctly identified its public interest

standard in the Final Order.

## Definition of the Public Interest Standard

Although the query of whether the public interest was the proper standard is

clear, the exact definition of that standard is somewhat opaque.  Sierra Club

contends that a prudence analysis on each core element of a settlement—such as

the Peaker Project—is necessary to support an overall public interest finding.[7]

Therefore, the definition of public interest is relevant to determine if a prudence

finding is a sine qua non of the public interest standard.  Based on the following,

however, we conclude that Sierra Club's argument fails.

Chapter 366 does not define public interest.  Thus this Court has stated that

the "determination of what is in the public interest rests exclusively with the

Commission." *Citizens I*, 146 So. 3d at 1173 (citing § 366.01, Fla. Stat.).  Yet the

Commission has not provided a clear recitation of its public interest standard.  The

Final Order, along with another recent Commission order, vaguely defines the

standard as completely fact dependent—"A determination of public interest

requires a case-specific analysis based on consideration of the proposed settlement

---

7. Although neither the Final Order nor the settlement agreement expressly
addresses the Peaker Project, it was established that the Project constituted a
substantial portion of the rate increase.

- 14 -

taken as a whole." *See In re Petition for Rate Increase by Gulf Power Co.*, 2017 WL 2212158, at \*6. Whereas, in the past, the Commission has occasionally provided a more tangible definition:

> The phrase "in the public interest" as used in Section 366.825, Florida Statutes, encompasses those matters within the jurisdiction of the Florida Public Service Commission. *In this case, we find that the phrase "in the public interest," means the cost and effect on rates and services provided by Gulf Power Company to its ratepayers. This is not to say, however, that we are precluded from considering other factors where appropriate, including environmental and health concerns,* in the interpretation of "in the public interest." Traditionally, however, the Commission has not done so, and there is no statutory mandate to consider such factors.

*Re Gulf Power Co.*, Order No. PSC-93-1376-FOF-EI at 15, 1993 WL 494325 (Fla. P.S.C. Sept. 20, 1993) (emphasis added).[8] A review of Commission final orders on settlement agreements reveals that much of its focus regarding the public interest centers on costs, effect on ratepayers, and ensuring reliability of service. *See, e.g.*, *In re Petition for Rate Increase by Gulf Power Co.*, 2017 WL 2212158, at \*6-7. This convention coincides with the purpose of the Commission. *See* §§ 366.04, 366.05, Fla. Stat. (2017); *City of St. Petersburg v. Carter*, 39 So. 2d 804, 806 (Fla.

---

8. Although this order concerned a different section of chapter 366, it is a "principle of construction that parts of a statute are not read in isolation." *GTC, Inc. v. Edgar*, 967 So. 2d 781, 787 (Fla. 2007). Thus the "doctrine of *in pari materia* . . . requires that statutes relating to the same subject or object be construed together to harmonize the statutes and to give effect to the Legislature's intent." *E.A.R. v. State*, 4 So. 3d 614, 629 (Fla. 2009) (quoting *Fla. Dep't of State v. Martin*, 916 So. 2d 763, 768 (Fla. 2005)).

1949); *Peoples Gas Sys., Inc. v. City Gas Co.*, 167 So. 2d 577, 583 (Fla. 3d DCA 1964). Likewise, a statutory prescription of factors for the Commission to consider buttresses this interpretation:

> In fixing fair, just, and reasonable rates for each customer class, the [C]ommission shall, to the extent practicable, consider the cost of providing service to the class, as well as the rate history, value of service, and experience of the public utility; the consumption and load characteristics of the various classes of customers; and public acceptance of rate structures.

§ 366.06(1), Fla. Stat.; *see also* § 366.041, Fla. Stat. (2017). Although we do not conclusively define the term today, *see Citizens I*, 146 So. 3d at 1173, a reasonable distillation of the Commission's public interest standard may be that it is a fact-dependent inquiry generally focused upon—but not limited to—the Commission's historical and statutory role.[9] Yet, regardless of the exact contours, any

---

9. Of course, it could be argued that renewable energy sources are in the public interest; therefore, renewables should be considered as part of the Commission's standard. In fact, it appears that the Legislature has declared as much: "The Legislature finds that it is in the public interest to promote the development of renewable energy resources in this state." § 366.91(1), Fla. Stat. (2017). On at least one occasion, the Commission has stated that it could consider environmental concerns as part of its public interest standard. *Re Gulf Power Co.*, 1993 WL 494325. Further, the Legislature has specifically authorized the Commission to consider the development of renewable energy. §§ 366.041(1), 366.81, 366.92, Fla. Stat. (2017). Correspondingly, preservation of the environment is an express constitutional policy preference. *See* art. II, § 7(a), Fla. Const. At a minimum, therefore, the Commission would be acting within its authority to consider and "encourage investment" in renewables. *See* § 366.92(1), Fla. Stat. However, that dispute is not before us today.

- 16 -

requirement for independent, individualized prudence review is notably absent from the definition.

Sierra Club contends that section 366.06(1) precluded the Commission's approval of the settlement agreement without first individually determining whether the Peaker Project was prudent. That argument fails. We have specifically approved the Commission's practice of reviewing settlements as a whole for the public interest and rejected the notion that the Commission must address each individual issue in the underlying rate case:

> Section 120.569(2)(l), Florida Statutes (2012), provides that "the final order in a proceeding which affects substantial interests must be in writing and include findings of fact, if any, and conclusions of law separately stated . . . ." Here, the Commission's final order discusses the major elements of the settlement presented for its review on FPL's motion to approve the settlement agreement. The Commission then lists how the terms of the settlement agreement changed after it noted its concerns to the intervenors and FPL. Further, the Commission explained why the settlement agreement was in the public interest. *Thus, although it may be the better practice to resolve every factual dispute in the final order, the Commission is not required by statute or case law to address each issue of disputed fact in its final order, and the final order otherwise satisfies section 120.569(2)(l).*

*Citizens I*, 146 So. 3d at 1153 (alteration in original) (emphasis added). In doing so, the Court noted that "[c]hapters 350 and 366, pertaining to the Commission and public utilities respectively, do not prohibit the Commission from approving a negotiated settlement to resolve a rate-making proceeding." *Id.* at 1150. Similarly, nothing in section 366.06 requires the Commission to lay out findings on prudence

in reviewing a proposed settlement. Naturally, the prudence of large capital investments is a relevant consideration in the Commission's review of a settlement under its public interest standard because imprudent investments of millions of dollars would likely clash with a public interest finding. *See supra* pp. 14-16. That analogy, however, does not impose an affirmative requirement upon the Commission to make and set forth independently specific prudence findings in a final order reviewing a settlement. It is crucial to remember that the Commission's standard here is the public interest despite any extent to which that standard may resemble prudence review.[10] Therefore, contrary to Sierra Club's assertion, it was not error for the Commission to apply its public interest standard and address the elements of the settlement agreement without independently and individually discussing the prudence of the Peaker Project. *See Citizens I*, 146 So. 3d at 1153.

There are practical considerations for this conclusion. Although the Peaker Project was a substantial issue, the fact remains that it was only one of the 167 issues that the Commission was required to consider as part of this multibillion-dollar settlement agreement. A requirement for the Commission to address the Peaker Project individually would correspondingly demand that the Commission

---

10. Importantly, in the absence of a settlement, prudence review of investments—regardless of magnitude—is still an express statutory requirement. § 366.06(1), Fla. Stat.

also address the remaining 166 issues in the same manner. This command would convert a short order into a boundless tome, despite the fact that the Commission found the settlement agreement to be in the public interest—a finding which we afford great deference. *E.g.*, *Citizens I*, 146 So. 3d at 1149.[11] For similar reasons, we have allowed nonunanimous settlement agreements over the objections of various intervenors. *Id.* at 1152-54; *S. Fla. Hosp. & Healthcare Ass'n v. Jaber*, 887 So. 2d 1210, 1212-13 (Fla. 2004) (affirming the Commission's approval of a nonunanimous settlement agreement despite the absence of a full evidentiary hearing). Due to the highly technical nature of rate case proceedings and the fact that many parties intervene in these cases, it is likely that parties will disagree on various details. However, it would be unreasonable to allow a single holdout party

---

11. Contrary to the special concurrence's proposed test—which focuses on the necessary showing for an appellant—the issue here is the proper standard to employ, and findings to make, in a Commission final order approving a settlement. If we required the Commission to make findings on certain issues, which would only be chosen on appeal if we consider them "of sufficient magnitude," then the Commission would be forced to make a finding on each issue in order to provide guidance for the proposed appellate test. *See* specially concurring op. at 30-31. The special concurrence bears out how quickly its own approach becomes muddled: apparently, the nearly $730 million Peaker Project is not "of sufficient magnitude" due to the structuring of cost recovery, the final specifics of which are unknowable because the settlement was in the form of a black box resolution. *See id.* at 31-32 and note 17. Rather than making new appellate findings, we instead focus on whether Sierra Club demonstrated that the Commission failed to make necessary and proper findings in the Final Order. *See Citizens I*, 146 So. 3d at 1153-54, 1164.

that does not get its way on one issue during settlement negotiations to derail the entire settlement process if settlement is fully in the public's interest all along. This is not to demean in any way the important role citizen groups, such as Sierra Club, have in this process. The record here simply demonstrates a need to replace the GTs and that the CTs were a satisfactory alternative; and the Commission followed the same procedure that we approved in *Citizens I*.[12]

---

12. Curiously, the special concurrence agrees that *Citizens I* resolved the Commission's proper standard, but it wonders "how we judge the Commission's decision in the context of an appeal by a non-settling party"—framing the analysis in terms of an invented appellate burden. Specially concurring op. at 30 note 16. Yet the opinion ignores *Citizens I*'s answer to that exact question. In *Citizens I*, we affirmed the Commission's order, in relevant part, "because [OPC (the non-settling appellant)] ha[d] not demonstrated that the Commission violated the essential requirements of law or committed a material error in procedure by approving the negotiated settlement agreement over [OPC's] active objection" and competent, substantial evidence supported the order. 146 So. 3d at 1153-54, 1164. Likewise, we stated above that "a party challenging an order of the Commission on appeal has the burden [to] show[] a departure from the essential requirements of law and the legislation controlling the issue, or that the findings of the Commission are not supported by competent, substantial evidence." *Supra* p. 8; *see Citizens I*, 146 So. 3d at 1149; *Crist*, 908 So. 2d at 430. In doing so, we are following the well-established precedent—which, through various iterations, stretches as far back as *Florida Rate Conference v. Florida R.R. & Public Utilities Commission*, 108 So. 2d 601, 605 (Fla. 1959)—rather than creating a new test. *Compare Citizens I*, 146 So. 3d at 1153-54, 1164, *with* specially concurring op. at 29-32. Pursuant to *Citizens I*, we simply conclude that it was not a departure from the essential requirements of law and legislation for the Commission to apply its public interest standard without making independent prudence findings on the Peaker Project. *Supra* pp. 13-14.

For those reasons, we conclude that an independent express prudence finding was not a prerequisite to a public interest finding. Accordingly, similar to *Citizens I*, we conclude that the public interest was the appropriate standard to apply and there was no need for the Commission to make an express individual prudence determination.[13]

## Sufficiency of the Final Order

Next, we must review the sufficiency of the Final Order. *See Citizens I*, 146 So. 3d at 1153; *see also* §§ 120.569(2)(l)-(m), 120.68(7)(d)-(e), Fla. Stat. (2017); *FPUC*, 213 So. 3d at 710-14. Sierra Club contends that the Commission failed to adequately "expose and elucidate" the basis for its decision as it pertained to the Peaker Project. Sierra Club's contention, however, fails because the Final Order adequately explained the Commission's decision.

Sierra Club analogizes *FPUC* to this case; but *FPUC* is inapposite. In *FPUC*, we held that "the Commission departed from the essential requirements of law by failing to adequately address application of the settlement agreement" when

---

13. We find it unnecessary to address the doubtful efficacy of the special concurrence's proposed test any further. That two-part test has no basis in any statute, case, or Commission order. The Commission's precedent, which this Court has approved, is to review settlements as a whole for the public interest, and we find no reason to doubt that this scheme protects the public. Whether or not it would be a wise approach to alter the well-established, existing course is the type of policy question better suited for the Legislature or the Commission rather than this Court. *See SACE*, 113 So. 3d at 748-49, 748 n.3.

it allowed cost recovery. *FPUC*, 213 So. 3d at 710-11. The Commission order there "did not perform any analysis of the [prior] settlement agreement" despite the fact that an earlier settlement precluded cost recovery. *Id.* at 713, 720. Thus the Court "determined that the Commission failed to perform its duty to explain its reasoning." *Id.* at 714. Yet, unlike *FPUC*, the Commission here was not reviewing costs that were precluded by an earlier settlement, and it had no duty to make a separate prudence finding. Therefore, contrary to Sierra Club's assertions, it was not a departure from the essential requirements of law for the Commission to make no independent findings on prudence.

With regard to sufficiency, *Citizens I* is again instructive. In *Citizens I*, this Court expressly rejected the argument that a Commission final order can be insufficient for failing to resolve every issue independently and explain why it overruled a party's objection to a settlement. 146 So. 3d at 1153. Again, we stated that, "although it may be the better practice to resolve every factual dispute in the final order, the Commission is not required by statute or case law to address each issue of disputed fact in its final order, and the final order otherwise satisfies section 120.569(2)(l)." *Citizens I*, 146 So. 3d at 1153. Section 120.569(2)(l) mandates that

> the final order in a proceeding which affects substantial interests must be in writing and include findings of fact, if any, and conclusions of law separately stated.

§ 120.569(2)(l), Fla. Stat. As discussed above, the Commission was not required to address the prudence of the Peaker Project because it was properly reviewing the settlement agreement—as a whole—under its public interest standard. Similar to the order in *Citizens I*, the Final Order here discussed the major elements of the settlement agreement and explained why it was in the public interest. *See* 146 So. 3d at 1153. Accordingly, we conclude that the Final Order sufficiently explained the Commission's decision. *See id.*; *see also Occidental Chem. Co. v. Mayo*, 351 So. 2d 336, 341 (Fla. 1977) ("Obviously, the Commission was not required to include in its order a summary of the testimony it heard or a recitation of every evidentiary fact on which it ruled."), *receded from on other grounds by Citizens of State v. Beard*, 613 So. 2d 403, 405 (Fla. 1992).

### Competent, Substantial Evidence

The only other matter for us to consider is whether competent, substantial evidence supported the Commission's public interest finding in the Final Order. *See Citizens I*, 146 So. 3d at 1164. We answer this question in the affirmative; hence we affirm the Final Order.

"As stated above, this Court will affirm the Commission's 'findings and conclusions if they are based upon competent, substantial evidence and are not clearly erroneous.' " *Id.* (quoting *SACE*, 113 So. 3d at 752). "Further, this Court 'will not overturn an order of the [Commission] because we would have arrived at

a different result had we made the initial decision and we will not re-weigh the evidence.' " *Id.* (alteration in original) (quoting *SACE*, 113 So. 3d at 753). Consequently, this Court reviews "the Commission's findings and conclusions [for competent, substantial evidence] that the settlement agreement established rates that were just, reasonable, and fair, and that the agreement is in the public interest." *Id.*

Similar to the order found sufficient in *Citizens I*, the Final Order detailed the procedural background of the Rate Case. It further detailed the major elements of the settlement agreement and explained how certain provisions changed from FPL's initial Rate Petition. Moreover, the Final Order described the basis for the rate increases, along with the provisions allowing FPL to invest in solar power and battery storage technologies. As shown below, competent, substantial evidence supported each of the Commission's various findings with regard to the settlement agreement.

FPL provides "excellent service" to its customers at "rates that are the lowest in the state and among the lowest in the country." The record demonstrates that FPL achieved high customer satisfaction ratings in the 2015 and 2016 J.D. Power and Associates rankings for the southeast. Additionally, FPL's 2020 1000-kilowatt-hour (kWh) residential bill is projected to be thirteen and thirty percent below the current state and national averages, respectively, even without taking

into account likely rate increases by other utilities. Thus competent, substantial evidence supported the Commission's finding that FPL provides quality service to customers at low rates.

The settlement agreement allows FPL to maintain its financial integrity by making capital investments "while providing rate stability and predictability." For example, the settlement agreement specifically authorizes FPL to make capital investments in renewable energies such as solar power and battery storage. Also, during the minimum term FPL is precluded from seeking base rate increases unless it is a SoBRA. As a result, competent, substantial evidence supported the Commission finding on rate stability and predictability.

The Signatories "represent a broad segment of FPL's customer base including both residential and commercial classes." Three parties constituted the Signatories: (1) OPC—the statutorily created representative of all FPL ratepayers; (2) FRF—a representative of a wide range of commercial customers; and (3) SFHHA—a representative of healthcare institutions. FIPUG took no position; Walmart and FEA did not oppose the settlement agreement. Only Sierra Club, AARP, and the Larsons opposed the settlement. AARP and the Larsons opposed the settlement agreement on unrelated grounds, leaving Sierra Club as the only party to take issue with this narrow prudence matter. Even OPC, which initially challenged the prudence of the Peaker Project, abandoned that position—after

ascertaining that FPL carried its burden on prudence—and settled. Thus the Commission's finding that the settlement represented a "broad segment of FPL's customer base" was supported by competent, substantial evidence.

The settlement agreement contains provisions addressing "[m]any of the positions advocated by these groups." Among the 167 issues in the Rate Case, many of the contentious matters were expressly resolved through the settlement agreement. Specifically, the Commission noted the following: FPL ceased natural gas hedging; FPL will construct cost-effective solar power; the proposed ROE was reduced; and the proposed depreciation rates were reduced by approximately $126 million. All of these findings were supported by competent, substantial evidence.

The settlement agreement constituted a reduction of approximately $400 million in revenue increases for 2017 from FPL's initial Rate Petition. FPL requested an increase of $826 million in 2017, but it received a $400 million increase. Therefore, this finding was supported by competent, substantial evidence.[14]

_____

14. According to Sierra Club, this finding is an inadequate basis for the Commission's decision because FPL's initial Rate Petition may have been imprudent or unreasonable. In another case there may be merit to such an assertion. However, FPL carried its burden here and the record supports the Commission's finding.

Finally, the Commission found that the settlement agreement—taken as a whole—reasonably resolved all of the issues in the Rate Case. The Signatories expressly agreed that the settlement agreement resolved all matters in the Rate Case; and, with the exception of the instant appeal, it ended the dispute.

The findings listed above are similar to those that the Commission regularly reviews in coming to a finding of public interest. *See Citizens I*, 146 So. 3d at 1164-65. As demonstrated above, competent, substantial evidence supported all of those findings. We conclude that the Commission's finding that the settlement agreement is in the public interest is necessarily supported by competent, substantial evidence.

## CONCLUSION

Accordingly, we hold that the Commission properly applied its public interest standard in reviewing the settlement agreement, which was supported by competent, substantial evidence; therefore, we affirm the decision below.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and POLSTON, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

While I fully agree with the majority's decision to affirm the order of the

Commission in this case, I would apply slightly different reasoning.

Sierra Club urges us to reject the Commission's approval of the settlement at issue here because the Commission did not make an express finding that FPL's sizable investment in new peaker units was prudent. The majority properly declines this invitation and reaffirms that the Commission is not required to make findings on all issues in a rate case in order to approve a settlement as "in the public interest." *Citizens of State of Fla. v. Fla. Pub. Serv. Comm'n*, 146 So. 3d 1143, 1150, 1153 (Fla. 2014).

The majority also properly recognizes that "the prudence of large capital investments is a relevant consideration in the Commission's review of a settlement under its public interest standard because imprudent investments of millions of dollars would likely clash with a public interest finding." Majority op. at 18. Even though the prudence of large capital investments is generally a relevant consideration, it is a matter of common sense that the Commission could look at all of the evidence presented in a case, consider the arguments of all parties, and determine the agreed rates to be "fair, just, and reasonable" and the settlement in the public interest, *see Citizens*, 146 So. 3d at 1153, without deciding each issue presented. For example, if the evidence were undisputed that most of the costs sought to be recovered were prudent investments, and that the agreed rates would be fair, just, and reasonable irrespective of the Commission's factual determination

- 28 -

as to most or all of the disputed costs or other minor issues, the Commission could easily approve the settlement by broadly finding it to be in the public interest, without resolving any of the individual issues identified by the parties as disputed. That is the case here, where the Commission found that FPL provides "excellent service" to its customers at rates that rank "among the lowest in the country" and lower than any other electric utility company operating in Florida.[15] Conversely, it seems equally obvious that a case could be presented with disputed cost elements large enough in relation to new rates agreed upon in a settlement that it would be impossible for the Commission to determine whether the rates were fair, just, and reasonable without first determining the prudence of that particular investment.

Given this Court's appropriate deference to the Commission's factual findings, *see Citizens*, 146 So. 3d at 1149 ("[W]hen reviewing an order of the Commission, this Court affords great deference to the Commission's findings."), and exercises of judgment, *see W. Fla. Elec. Coop. Ass'n v. Jacobs*, 887 So. 2d 1200, 1204 (Fla. 2004) ("Commission orders come to this Court clothed with the presumption that they are reasonable and just."), and the general rule that factual findings are not required on all issues, *Citizens*, 146 So. 3d at 1150, 1153, I would think that any party challenging the Commission's approval of a settlement on

---

15.  Significantly, Sierra Club does not challenge the Commission's basic findings regarding FPL's high level of service and low cost of service.

grounds that the Commission failed to make certain findings would necessarily have to convincingly show (1) a genuine factual dispute, apparent from the record, as to the issue, and (2) that the issue is of sufficient magnitude that its resolution would be required before the reasonableness of the agreed rates could be demonstrated or determined. I agree that an affirmance is appropriate in this case because Sierra Club did not make either showing.[16]

---

16. The majority criticizes this "proposed test" on grounds that it improperly "focuses on the necessary showing for an appellant" rather than "the proper standard to employ, and findings to make, in a Commission final order approving a settlement." Majority op. at 19 n.11. In my view, the proper standard for the Commission's approval of a settlement was resolved by this Court in *Citizens*. Given that we do not have the authority to review Commission decisions in the absence of an appeal, *see* § 366.10, Fla. Stat. (2017), and that when an appeal is brought our review is limited to the issues raised by the parties, *see AmeriSteel Corp. v. Clark*, 691 So. 2d 473, 477 (Fla. 1997) (citing *United Tel. Co. v. Public Serv. Comm'n*, 496 So. 2d 116, 118 (Fla. 1986), and *Shevin v. Yarborough*, 274 So. 2d 505, 508 (Fla. 1973)) (noting that Commission orders are presumed to be "such as ought to have been made" and that the party challenging a Commission order has the burden to prove otherwise), the question becomes how we judge the Commission's decision in the context of an appeal by a non-settling party. A natural way to frame the analysis, in this context, is in terms of the burden on the appealing party. *Cf. Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979) ("In appellate proceedings the decision of a trial court has the presumption of correctness and the burden is on the appellant to demonstrate error."). Where, as here, an appellant argues that the Commission's failure to address a particular issue shows that the Commission's approval of the settlement was arbitrary and unsupported by competent, substantial evidence, it is beneficial to the parties and the public to explain our reasons for disagreeing. The general proposition that the Commission is not required automatically to make findings on all issues is a useful starting point, but it does not fully explain our rejection of the argument that a particular issue was so significant to this specific case that the Commission's approval of the settlement without addressing the issue

- 30 -

As for the first necessary showing, Sierra Club has not demonstrated any basis, from this record, to question the prudence of the peaker investment. FPL laid out a compelling case that the investment was necessary for continued system reliability and was the most cost-effective option available to provide that necessary reliability. According to the testimony, although the Peaker Project's costs were responsible for $92 million of FPL's 2017 base rate increase request (of $866 million), the project will save customers $203 million in fuel costs and other expenses over the operating life of the units—while also significantly reducing air emissions. This evidence establishes FPL's case for prudence, and no other party presented evidence undermining FPL's case. Sierra Club did cross-examine an FPL witness regarding whether the demand could be met with solar cells or batteries (for electricity storage). But, the evidence demonstrates that solar cells cannot be relied upon to meet peak or emergency demand and that batteries would not have been cost-effective.

Because Sierra Club has failed to demonstrate a genuine factual dispute as to the prudence of the peaker investment, there is no need to consider the second showing that would appear to be necessary to cast doubt on the Commission's public interest finding: that the peaker investment was so large in comparison to

could only be considered arbitrary and unsupported. The framework I suggest would provide the needed explanation.

- 31 -

the other, uncontested costs for which FPL sought recovery that the reasonableness of the agreed rate increase could not be determined without a prudence finding on the peaker issue. Nor did Sierra Club attempt to make this second showing.[17]

For these reasons, I would affirm the Commission's approval of the settlement agreement.

By contrast, the majority's rejection of Sierra Club's argument appears to be premised in part on an assertion that requiring findings on any issue would require findings on all issues and unnecessarily expand the length of the Commission's orders. Majority op. at 19 ("A requirement for the Commission to address the Peaker Project individually would correspondingly demand that the Commission also address the remaining 166 issues in the same manner. This command would convert a short order into a boundless tome, despite the fact that the Commission

_____

17. It would have been difficult for Sierra Club to have made this second showing even if it could have called the prudence of the Peaker Project into doubt. Although the capital costs for the Peaker Project were large, those costs accounted for only 11.14% ($92 million) of FPL's adjusted original $826 million 2017 base rate increase request. In light of the settlement's 51.57% ($426 million) reduction from the 2017 requested rate increase (setting a 2017 base rate increase of $400 million instead of $826 million), the evidence presented to the Commission in support of the adjusted original base rate increase request, the minimal opposition to the remainder of the settlement agreement among the interested parties, and the ultimate lack of opposition to the Peaker Project by any of the many other interested parties, it is easy to understand why the Commission would have deemed it unnecessary to separately address the Peaker Project in support of its general findings.

found the settlement agreement to be in the public interest . . . .").  For the reasons explained above, I disagree with the assertion that requiring findings on one issue in a settled case would necessarily mean that findings were required on all issues before the settlement could be approved.  Moreover, employing the analysis suggested above would allow the majority to avoid the circular reasoning inherent in rejecting Sierra Club's argument that the public interest cannot be determined without a prudence finding on the peaker units by simply asserting that "the Commission found the settlement agreement to be in the public interest."  Majority op. at 19.

CANADY, J., concurring in result.

I agree with Justice Lawson that the "Sierra Club has not demonstrated any basis, from this record, to question the prudence of the peaker investment."  Specially concurring op. at 31.  Indeed, there is competent, substantial evidence in the record supporting a conclusion that the peaker investment was a prudent investment.  This is a sufficient ground for rejecting the Sierra Club's challenge to the approval of the settlement agreement and affirming the final order of the PSC, which determined "that the Settlement Agreement establishes rates that are fair, just, and reasonable and is in the public interest."  Majority op. at 7.

An Appeal from the Florida Public Service Commission

Joshua Smith, Staff Attorney, Oakland, California, Diana A. Csank and Julie Kaplan, Staff Attorneys, Sierra Club, Washington, District of Columbia,

for Appellant

Keith C. Hetrick, General Counsel, Samantha M. Cibula, Attorney Supervisor, and Rosanne Gervasi, Senior Attorney, Florida Public Service Commission, Tallahassee, Florida,

for Appellee Florida Public Service Commission

J.R. Kelly, Public Counsel, Patricia A. Christensen, Associate Public Counsel, and Charles J. Rehwinkel, Deputy Public Counsel, Office of Public Counsel, The Florida Legislature, Tallahassee, Florida,

for Appellee Citizens of the State of Florida

Stuart H. Singer of Boies Schiller Flexner LLP, Fort Lauderdale, Florida; and John T. Butler, Assistant General Counsel – Regulatory, and María José Moncada, Senior Attorney, Florida Power & Light Company, Juno Beach, Florida,

for Appellee Florida Power & Light Company

Robert Scheffel Wright and John Thomas LaVia III of Gardner, Bist, Bowden, Bush, Dee, LaVia & Wright, P.A., Tallahassee, Florida,

for Appellee Florida Retail Federation

John S. Mills and Courtney Brewer of The Mills Firm, P.A., Tallahassee, Florida,

for Amicus Curiae City of South Miami

Deb Swim of Debra Swim, Attorney, PLLC, Tallahassee, Florida,

for Amicus Curiae League of Women Voters of Florida, Inc.