# Supreme Court of Florida

_____

No. SC18-213
_____

**CITIZENS OF THE STATE OF FLORIDA,**
Appellants,

vs.

**JULIE IMANUEL BROWN, etc., et al.,**
Appellees.

April 25, 2019

LABARGA, J.

On behalf of the Citizens of the State of Florida, the Office of Public Counsel (OPC) appeals a decision of the Florida Public Service Commission (PSC) allowing the Florida Power and Light Company (FPL) to recover certain environmental compliance costs from ratepayers pursuant to section 366.8255, Florida Statutes (2018). *See In re Envtl. Cost Recovery Clause*, Order No. PSC-2018-0014-FOF-EI (Fla. Pub. Serv. Comm'n Jan. 5, 2018). We have jurisdiction. *See* art. V, § 3(b)(2), Fla. Const. For the reasons explained herein, we affirm the PSC's decision.

# BACKGROUND

FPL operates the Turkey Point Power Plant (Turkey Point), an 11,000-acre facility located on the shores of Biscayne Bay and Card Sound, roughly twenty-five miles south of Miami. Among the five power-generation units at Turkey Point are two nuclear units, referred to as Unit 3 and Unit 4.

Adjacent to the west side of Turkey Point is the Cooling Canal System (CCS), a 5,900-acre network of unlined canals which serves as the cooling system for Units 3 and 4. Units 3 and 4 are cooled by taking water from the CCS into a heat transfer infrastructure in the power plant. The heated water is then discharged from the power plant into the CCS, where it circulates and cools as it returns to the intake point. By the time the water again reaches the intake point around forty-eight hours later, its temperature has reduced sufficiently to allow it to be useful for cooling. The water is then pumped back out of the CCS into the heat exchange infrastructure, and the cycle begins again. The CCS is a closed-loop system, meaning it does not take in any water from surrounding surface waters, nor does it discharge water into them. Because the CCS is unlined, however, its waters percolate into and mix with the surrounding groundwater.

FPL constructed the CCS in 1971 pursuant to an agreement with the United States Department of Justice. The canals were dug by dragline, and saline groundwater was allowed to naturally fill them via seepage. At that time, the water

in the CCS was the same salinity as the adjacent waters of Biscayne Bay. The water in the CCS is recharged naturally by further groundwater inflows and by rainwater, and water leaves the CCS through evaporation and seepage. From 1972 until 2013, no external water sources were used—such as pumping additional water from Biscayne Bay—to augment the effect of annual precipitation and groundwater inflow on the water level in the CCS. As a result, the salinity of the water in the CCS has increased over time: in 2013, the average salinity of the water in the CCS was 70 Practical Salinity Units (PSU), more than double the average salinity of seawater.

The CCS sits atop the Biscayne Aquifer, which extends to the north and west of the CCS. Although some layers of the Biscayne Aquifer contained saline water as early as the 1940s, the shallower layers formed a "lens" of fresh water at the top of the Aquifer. At the time the CCS was constructed, FPL understood the salinity of the waters in the CCS would increase over time. Water of higher salinity is denser than water of lower salinity and will tend to sink through lower-salinity water if placed on top of it.

To prevent CCS water from migrating inland toward the Everglades and to protect the freshwater lens in the top layers of the Biscayne Aquifer, FPL constructed an eighteen-foot-deep interceptor ditch along the western edge of the CCS. As its name suggests, the interceptor ditch's purpose was to act as a physical

barrier between the CCS and adjacent waters.  Pursuant to a 1972 agreement with the South Florida Water Management District (SFWMD),[1] FPL was required to operate the interceptor ditch in such a way as to ensure that movement of saline waters into adjacent groundwater did not exceed the amount which would occur without the existence of the CCS.

The 1972 agreement also required FPL to monitor nearby groundwater for any effects caused by the operation of the CCS.  This agreement has been modified several times through supplemental agreements between the SFWMD, or its predecessors, and FPL.  The Fourth Supplemental Agreement, which became effective in 1983, reduced FPL's monitoring requirements in light of FPL's satisfactory compliance with the provisions of earlier agreements and a perceived reduced need for monitoring.  Studies conducted over the years by researchers working under contract with FPL identified increased salinity in some layers of the Biscayne Aquifer, but ascribed these measurements to seasonal fluctuations in salinity caused by a variety of natural processes, such as variable rainwater inputs in wetter or drier years.

In 2008, FPL applied for regulatory permissions to begin a project, known as the Uprate, to increase the generating capacity of Turkey Point.  As part of the

---

1. At the time, the SFWMD was known as the Central and Southern Florida Flood Control District.

Uprate, and in light of the increased thermal load the Uprate would place on the CCS, the Florida Department of Environmental Protection (DEP) issued new Conditions of Certification for the uprated units. The Conditions of Certification specifically noted that the Uprate could cause the temperature and salinity of the CCS to increase, and imposed conditions to address these changes. Condition X "sets forth the framework for new monitoring and, as may be needed, abatement or mitigation measures" with regard to impacts of the CCS on nearby surface waters and groundwater. Condition X also required FPL to enter into a Fifth Supplemental Agreement with the SFWMD laying out the details of the new monitoring arrangement.

In October 2009, FPL and the SFWMD entered into the Fifth Supplemental Agreement which, together with the Conditions of Certification, created what is known as the 2009 Monitoring Plan.[2] The agreement stated that the SFWMD had evaluated "recent monitoring data" which indicated "the interceptor ditch may not be effective in restricting the movement of saline water westward from the [CCS]." It further noted that "a full delineation" of past, present, and future impacts of the CCS on nearby groundwater was "a necessary first step in evaluating existing conditions and, if necessary, identifying potential solutions to abate, mitigate, or

_____

2. The parties also refer to the 2009 Monitoring Plan as the Turkey Point Cooling Canal Monitoring Plan Project, or TPCCMP.

remediate the movement of saline water and other water quality and ecological impacts from the [CCS]." To accomplish this, the Fifth Supplemental Agreement required FPL to implement the 2009 Monitoring Plan. It further provided that, if the SFWMD determined the expanded monitoring required by the 2009 Monitoring Plan revealed a need for corrective action, FPL and the SFWMD would consult with one another to identify and implement measures to mitigate, abate, or remediate the impacts of the CCS.

FPL petitioned the PSC to allow recovery of the costs of implementing the 2009 Monitoring Plan pursuant to section 366.8255, Florida Statutes, and the PSC approved recovery of those costs. *See In re Envtl. Cost Recovery Clause*, Order No. PSC-09-0759-FOF-EI (Fla. Pub. Serv. Comm'n Nov. 18, 2009). In its order approving recovery, the PSC approved a stipulation that "the water quality issues the [2009 Monitoring Plan] is being undertaken to address relate to *the operation of the Turkey Point plant as a whole* and not just the [Uprate]." *Id.* at 13 (emphasis added).

Between 2009 and 2016, FPL provided updated testimony regarding the status of the 2009 Monitoring Plan and FPL's actions in response to consultations with environmental regulators during that period arising out of data gathered through the 2009 Monitoring Plan. Those data revealed that, over the decades of the CCS's operation, a hydraulic gradient had formed in which the hypersaline

- 6 -

water of the CCS seeped into the lower-salinity waters of the Biscayne Aquifer below, forming a plume of hypersaline water that is spreading through the Aquifer. Once the water directly below the CCS was saturated to the depth of the less-transmissive limestone layer which defines the lower boundary of the Biscayne Aquifer, the hypersaline plume began to migrate westward through more laterally transmissive layers. By 2014, monitoring data allowed regulators to conclude that CCS waters had infiltrated into the Biscayne Aquifer as much as three miles west of the CCS, and that the CCS was releasing, on average, 600,000 pounds of salt per day into the Biscayne Aquifer.

On April 16, 2013, the SFWMD issued written notice to FPL that the SFWMD had determined saline intrusions into the Biscayne Aquifer had exceeded levels that would have been present in the absence of the CCS. Pursuant to the Fifth Supplemental Agreement, the SFWMD directed FPL to begin consultations to identify mitigation, abatement, or remediation measures. The Miami-Dade County Department of Environmental Resources Management (DERM) issued a Notice of Violation (NOV) to FPL on October 2, 2015, alleging the westward migration of hypersaline water from the CCS violated Miami-Dade County Code section 24-42(4). DEP issued an NOV of its own on April 25, 2016.

Following issuance of the respective NOVs, FPL entered into a Consent Agreement (CA) with DERM, and a Consent Order (CO) with DEP.[3] The CA stated that "DERM maintains there is hypersaline water attributable to FPL's actions in the groundwaters outside the boundaries of the [CCS], which exceeds County water standards and criteria." The CA further states that FPL "acknowledges" the presence of hypersaline water in those areas and "agrees to the terms of [the CA] without admitting the allegations made by the . . . NOV."

The CA requires FPL to "freshen" the CCS by pumping fresh water—approximately fourteen million gallons per day—from the Upper Floridan Aquifer into the CCS. It also requires FPL to construct a Recovery Well System (RWS) to "intercept, capture, contain, and retract the hypersaline groundwater" to the boundaries of the CCS. The RWS would accomplish this by pumping hypersaline water out of the Biscayne Aquifer and injecting it into a naturally saline feature known as the Boulder Zone Formation, located 3,200 feet beneath the ground surface. FPL's models predicted the RWS would cause the hypersaline plume to stop expanding after three years of operation, would begin to retract it after five

---

3. The CA was later amended to include monitoring and remediation for exceedances of permitted ammonia levels in Biscayne Bay. That amendment is referred to as the CAA.

years, and would achieve complete retraction of the plume into the boundaries of the CCS after ten years.

The CO contains similar provisions, requiring FPL to maintain the salinity of the CCS at or below 34 PSU, to halt the intrusion of hypersaline CCS water into nearby groundwater, and to mitigate the impact of the hypersaline plume. The CO independently requires FPL to operate the RWS and requires the extent of the hypersaline plume to be established by Continuous Surface Electromagnetic Mapping.

In 2016, FPL petitioned the PSC for recovery of actual and estimated environmental compliance costs, including those associated with the CO and CA. At that time, the PSC deferred consideration of those costs until its 2017 Environmental Cost Recovery docket. *In re Envtl. Cost Recovery Clause*, Order No. PSC-16-0535-FOF-EI, at 12 (Fla. Pub. Serv. Comm'n Nov. 22, 2016). The PSC held hearings in its 2017 Environmental Cost Recovery docket on October 25-27, 2017. During those hearings and in its briefing before the PSC, FPL argued the PSC had, in its 2009 order, approved the 2009 Monitoring Plan itself for cost recovery pursuant to section 366.8255, and that FPL had presented evidence at that time "that the project may need to progress from monitoring to implementation of taking required corrective actions, if warranted by the results of the monitoring." FPL contended the costs of the CO and CA were reasonable and prudent

environmental compliance costs incurred through the implementation of agreements with environmental regulators, and therefore should be recoverable through the section 366.8255 mechanism. In all, FPL estimated it would spend $176 million in environmental compliance costs "to fulfill its obligations under the [CA] and [CO]" by 2027.

OPC, the Southern Alliance for Clean Energy, and the Florida Industrial Power Users Group opposed FPL's petition. OPC emphasized that the costs FPL sought to recover were incurred as "the direct result of FPL's repeated decades-long failures to prudently manage its nuclear facility's cooling canal water." OPC contended that to regard the costs at issue in this case as outgrowths of the 2009 Monitoring Plan mischaracterized those costs, given that the costs are an order of magnitude greater than the costs of the 2009 Monitoring Plan. OPC further argued that the section 366.8255 mechanism allows "timely recovery of costs imposed by prospective regulations to prevent harm," but does not allow recovery of costs of efforts to remediate past environmental harm. OPC contended that, because of the "clearly preventive orientation" of section 366.8255, the costs of complying with the CO and CA do not qualify for recovery because the harm in question has already occurred.

The PSC approved FPL's recovery of $132,577,031 as costs of compliance with the CO and CA pursuant to section 366.8255. *In re Envtl. Cost Recovery*

- 10 -

*Clause*, Order No. PSC-2018-0014-FOF-EI, at 5, 22-23. The PSC rejected OPC's argument that remediation costs were per se ineligible for recovery under section 366.8255, and held FPL could recover its costs of complying with the CO and CA through the section 366.8255 mechanism. *Id.* at 8.

The PSC also found "[t]he costs FPL is requesting to recover are the result of the anticipated evolution of the original [2009 Monitoring Plan]." *Id.* at 18. The PSC noted its 2009 order approving the 2009 Monitoring Plan had specifically acknowledged the potential for mitigation costs to arise out of the expanded monitoring, and that the 2009 order had stated the 2009 Monitoring Plan had been undertaken to address water quality issues linked to the operation of Turkey Point generally, beyond just those connected with the Uprate. *Id.* at 17. Therefore, the PSC found, the 2009 Monitoring Plan "is inclusive of the plant as a whole." *Id.* at 18. The PSC reasoned that "an increase in costs itself is not a change in scope of a project," and referenced testimony presented by FPL that environmental compliance programs routinely evolve from monitoring to mitigation and remediation. *Id.* at 17-18.

OPC appealed, arguing that section 366.8255, Florida Statutes, limits cost recovery to costs incurred in preventing future environmental harm. OPC further contends the PSC erred when it concluded the costs of implementing the CO and CA were anticipated evolutions of the 2009 Monitoring Plan.

# ANALYSIS

## *Protecting the Environment*

Section 366.8255, Florida Statutes, also known as the Environmental Cost Recovery Clause or ECRC, allows a public utility to petition the PSC for recovery of "prudently incurred environmental compliance costs . . . through an environmental compliance cost-recovery factor that is separate and apart from the utility's base rates." § 366.8255(2), Fla. Stat. (2018). "Environmental compliance costs" are defined as "all costs or expenses incurred by an electric utility in complying with environmental laws or regulations." *Id.* § 366.8255(1)(d). "Environmental laws or regulations" are, in turn, defined as "all federal, state, or local statutes, administrative regulations, orders, ordinances, resolutions, or other requirements that apply to electric utilities and are designed to protect the environment." *Id.* § 366.8255(1)(c).

OPC contends the phrase "protect the environment" limits recovery of costs under section 366.8255 to costs incurred in preventing future environmental harm, because the word "protect" is inherently forward-looking and any measure which mitigates, remediates, or otherwise cleans up existing harm does not "protect the environment." Therefore, OPC argues, the PSC erred in approving recovery of the costs of compliance with the CO and CA because those costs have been and will be

incurred in the course of redressing past environmental harm, not preventing future environmental harm.

This issue presents a question of statutory interpretation by an administrative agency, which we review de novo. Art. V, § 21, Fla. Const. "[W]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984) (quoting *A.R. Douglass, Inc. v. McRainey*, 137 So. 157, 159 (Fla. 1931)).

The phrase "protect the environment" has a clear and definite meaning. Standing alone, the word "protect" means to safeguard a thing or shield it from injury. *See, e.g.*, *Merriam-Webster's Collegiate Dictionary* 999 (11th ed. 2003). Any prospective element of this definition is a function of cause and effect: a protective measure cannot turn back time and prevent a harm which has already occurred. When the thing to be protected is the environment, however, the relationship between prospective and retrospective measures is more complex. Unlike types of harm which, by their nature, occur as discrete incidents, environmental harm can take the form of ongoing damage caused by a continuous presence of pollutants in a resource or ecosystem. *See, e.g.*, *Fla. Dep't of Envtl. Protection v. Fleet Credit Corp.*, 691 So. 2d 512, 513-14 (Fla. 4th DCA 1997)

- 13 -

(explaining the "continuing injury to groundwater caused by the current seepage of hazardous substances disposed and discharged on commercial property in the 1980s" and noting that "it is the ongoing contamination, not the initial disposal of wastes, that constitutes a continuing, but abatable, nuisance").  In such a situation, the remediation of past harm through abatement of the pollution-causing source and cleanup of contaminated resources or ecosystems is an essential part of shielding as-yet uncontaminated ecosystems, or portions thereof, from harm. Perhaps unlike some other kinds of protective measures, actions prudently needed to "protect the environment" can primarily remedy existing conditions caused by past actions, provided the harm in question continues to adversely impact the environment.  This would be especially true where continuing environmental damage is expected to spread and increase if remedial action is not taken.

The present case illustrates this principle.  Hypersaline waters have migrated into the Biscayne Aquifer, and the hypersaline plume from the CCS is causing the interface between fresh and saline water in the Biscayne Aquifer to migrate farther west.  The waters of the Biscayne Aquifer are an important natural resource, and the intrusion of saline waters into the Biscayne Aquifer impairs the reasonable and beneficial use of the waters in the Biscayne Aquifer.  If the existing hypersaline plume were removed by the RWS but the water in the CCS were not freshened, hypersaline water would continue to infiltrate into the Biscayne Aquifer and the

- 14 -

existing harm would continue to expand. If the water in the CCS were freshened but the RWS were not operated, the hypersaline plume would remain in the Biscayne Aquifer and the existing harm would both continue into the future and expand in the future by diffusing farther into the Biscayne Aquifer. By removing the existing hypersaline plume and freshening the CCS, FPL is both remedying the existing harm and preventing future harm. Because of the nature of the environmental harm at issue in this case, prevention and remediation are inextricably intertwined. Safeguarding the Biscayne Aquifer from future saline intrusion requires the cleanup of existing saline intrusion, and that action protects the environment from future harm.[4]

We therefore reject OPC's reading of section 366.8255(1)(c) and affirm the decision of the PSC with respect to this issue.

*Evolution of 2009 Monitoring Plan*

OPC further argues the PSC erred when it determined the costs of the CO and CA were "the result of the anticipated evolution of the original [2009 Monitoring Plan]," and are therefore within the scope of the 2009 Monitoring Plan, for which the PSC had previously approved recovery. *In re Envtl. Cost Recovery*

_____

4. Our decision today does not address situations in which the environmental harm is completely contained and the remediation for which the utility seeks cost recovery would not be preventing additional future harm. That question is not presented in this case, and we render no opinion as to that issue.

*Clause*, Order No. PSC-2018-0014-FOF-EI, at 17-18. The PSC explained its decision by noting that its 2009 order approving recovery of the costs incurred in implementation of the 2009 Monitoring Plan "specifically included discussion of the potential for mitigation costs." *Id.* at 17. The PSC further noted its 2009 order had determined that the 2009 Monitoring Plan was concerned with monitoring the environmental impacts of the operation of Turkey Point as a whole and was not limited to monitoring the impacts of the Uprate. *Id.* at 17-18. The PSC also referred to testimony by FPL witness Michael Sole that "environmental compliance programs evolve based upon information that determines the next appropriate action." *Id.* at 18. Based upon the record before it in this docket, and upon the language of its 2009 order, the PSC concluded the costs at issue in this case "shall be considered part of the existing [2009 Monitoring Plan]." *Id.*

The PSC's determination that the costs at issue in this case are an anticipated evolution of the 2009 Monitoring Plan is a finding of fact, which this court will not disturb if it is supported by competent, substantial evidence in the record. *Sierra Club v. Brown*, 243 So. 3d 903, 907-08 (Fla. 2018).

We conclude there is competent, substantial evidence in the record to support the PSC's conclusion. The Conditions of Certification for the Uprate and the Fifth Supplemental Agreement with the SFWMD both characterize the 2009 Monitoring Plan as an investigative first step to determine the environmental

- 16 -

impacts of the Uprate specifically and also FPL's operation of Turkey Point more generally. Moreover, by requiring FPL to consult with the SFWMD regarding mitigation, abatement, and remediation measures if the data indicated the need for such measures, the Fifth Supplemental Agreement—out of which the 2009 Monitoring Plan arose—contemplated the possibility that the 2009 Monitoring Plan could evolve to include active environmental protection measures.

As the record reflects, this is precisely what occurred: the monitoring data led environmental regulators to conclude the CCS was causing violations of applicable groundwater quality standards, and those conclusions resulted in the CO and CA. This evolution from monitoring to remediation is reflected in the regular updates FPL provided to the PSC between 2009 and 2015 regarding the expectations of the 2009 Monitoring Plan, the initial corrective actions FPL took, and finally the requirements of the CO and CA themselves. We therefore conclude the PSC's finding on this issue is supported by competent, substantial evidence in the record and affirm the PSC's decision with respect to this issue.

## CONCLUSION

Based on the foregoing, we hereby affirm the decision of the Florida Public Service Commission.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, LAGOA, LUCK, and MUÑIZ, JJ., concur.

- 17 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Florida Public Service Commission

J.R. Kelly, Public Counsel, Stephanie A. Morse, Associate Public Counsel, and Charles J. Rehwinkel, Deputy Public Counsel, Office of Public Counsel, The Florida Legislature, Tallahassee, Florida,

for Appellant

Keith C. Hetrick, General Counsel, Samantha M. Cibula, Attorney Supervisor, and Rosanne Gervasi, Senior Attorney, Florida Public Service Commission, Tallahassee, Florida,

for Appellee Florida Public Service Commission

Stuart H. Singer and Pascual A. Oliu of Boies Schiller Flexner LLP, Fort Lauderdale, Florida; and John T. Butler, Assistant General Counsel – Regulatory, and María José Moncada, Senior Attorney, Florida Power & Light Company, Juno Beach, Florida,

for Appellee Florida Power & Light Company