727 So.2d 259 (1999)
GULF COAST ELECTRIC COOPERATIVE, INC., Appellant,
v.
Julia L. JOHNSON, et al., Appellees.
No. 92,479.
Supreme Court of Florida.
February 18, 1999.
*260 John H. Haswell of Chandler, Lang & Haswell, P.A., Gainesville, Florida, and J. Patrick Floyd, Port St. Joe, Florida, for Appellant.
Robert D. Vandiver, General Counsel, and Richard C. Bellak, Associate General Counsel, Florida Public Service Commission, Tallahassee, Florida; and Jeffrey A. Stone and Russell A. Badders of Beggs & Lane, Pensacola, Florida, on behalf of Gulf Power Company, for Appellees.
PARIENTE, J.
Gulf Coast Electric Cooperative, Inc. (Gulf Coast) appeals an order of the Public Service Commission (PSC) concerning a territorial dispute between Gulf Coast and Gulf Power Company (Gulf Power).[1] We have jurisdiction. See art. V, § 3(b)(2). For the reasons that follow, we affirm the PSC's decision.

*261 I. FACTS
This is the second appeal in a dispute between Gulf Coast and Gulf Power regarding which party has the right to provide electrical service to certain areas in west Florida. In the first appeal, this Court reversed the PSC's decision that Gulf Power had the right to provide electrical service to the Washington County correctional facility. See Gulf Coast Elec. Coop. v. Clark, 674 So.2d 120 (Fla.1996). In this case, Gulf Coast petitioned the PSC to impose territorial boundaries to establish designated geographical areas where each utility would have the exclusive right to provide electrical service in the future.
At issue are developed areas in south Washington and Bay counties where it is undisputed that the two utilities have commingled facilities, as well as additional areas in these counties that are primarily undeveloped. Unlike the situation in the first appeal, in this appeal there is no present dispute regarding service to any current or future identifiable customers. In fact, both utilities agree that existing customers of either facility should not be switched in the commingled areas, even if a boundary were to be established.
After a two-day hearing, which included visits by the commissioners to fifteen locations in the areas in question and the consideration of multiple exhibits and witnesses, the PSC found in a two-to-one decision that territorial boundaries should not be imposed at this time. In an eleven-page order detailing its findings, the PSC concluded that:
There is no assurance that a territorial boundary is going to be the most economic way of providing service. We have established that the facilities are commingled and that the incremental cost to serve additional customers is negligible. Thus, in the congested areas, a `line on the ground' will cure neither past nor future duplication. In the undeveloped areas, a line on the ground will eliminate the flexibility the utilities need to determine which one is in the most economic position to extend service. That flexibility will result in the least cost service provision. It is inappropriate for us to draw lines in undeveloped areas in south Washington and Bay Counties where we do not know what the expansion patterns are going to be. The utilities are the entities with the best evidence of what their long range plans are, what their systems are and what is the most economic way of providing additional service.
It is not our position that establishing a territorial boundary is never appropriate. In this instance, the purpose of the hearing was to explore the situation in south Washington and Bay Counties in its entirety. In Order No. PSC-95-0913-FOF-EU, issued July 27, 1995, we ordered the parties to establish a territorial boundary in those areas "where facilities are commingled ... and where further conflict is likely." As stated previously, the evidence in the record is that while the facilities are commingled, further conflict is not likely because the facilities are already in place. If a specific dispute occurs, such as a prison being built in an undeveloped area, we have jurisdiction to, on a case-by-case basis, draw a line within the given area and we will continue to appropriately exercise our jurisdiction to do so. This Order is limited to the identified areas of south Washington and Bay Counties and shall have no effect on established territorial boundaries throughout Florida that have heretofore been created and approved.
Order No. PSC-95-0913-FOF-EU also stated that "[a] boundary is not necessarily required in areas where there is no conflict and none is reasonably foreseeable." In those areas, the utilities were encouraged to consider a wide range of solutions to accommodate future growth. Gulf Power has suggested criteria for the delineation of service territory in south Washington and Bay Counties. Gulf Power's guidelines, along with the established Commission precedent for determining service areas, can provide the utilities with the flexibility they need to address growth and it will result in the most economic method of providing service. Carving up the two counties, in this instance, will not result in the most economic provision of electric service. Rather, drawing lines on *262 the ground would result in centralized planning by this Commission which is not the most economic way to determine the service areas because it does not take into account market forces which will dictate the manner in which some of the expansion of facilities is going to take place.
Although refusing to establish territorial boundaries at this time, the PSC explicitly reserved jurisdiction to resolve any future disputes regarding particular customers on a case-by-case basis.
On appeal, Gulf Coast argues that the PSC was required to impose territorial boundaries under the circumstances of this case, and its refusal to do so is not supported by competent substantial evidence. In the alternative, Gulf Coast argues that the PSC was obligated to establish territorial boundaries based on its previous orders entered in the administrative proceedings in this case.

II. STANDARD OF REVIEW
We begin our analysis by emphasizing the scope of this Court's review of PSC orders. Although the Florida Constitution vests this Court with mandatory jurisdiction to hear appeals from PSC orders, see art. V, § 3(b)(2), Fla. Const., our review function is circumscribed by certain well-established principles:
Commission orders come to this Court "clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made." Moreover, an agency's interpretation of a statute it is charged with enforcing is entitled to great deference. The party challenging an order of the Commission bears the burden of overcoming those presumptions by showing a departure from the essential requirements of law. We will approve the Commission's findings and conclusions if they are based on competent substantial evidence,[[2]] and if they are not clearly erroneous.
AmeriSteel Corp. v. Clark, 691 So.2d 473, 477 (Fla.1997) (citations omitted) (quoting PW Ventures, Inc. v. Nichols, 533 So.2d 281, 283 (Fla.1988)). Considering the PSC's specialized knowledge and expertise in this area, this deferential standard of review is appropriate. See Gulf Oil Co. v. Bevis, 322 So.2d 30, 32 (Fla.1975), superseded by statute on other grounds as stated in General Dev. Utils., Inc. v. Hawkins, 357 So.2d 408, 409 n. 4 (Fla.1978); see also Public Serv. Comm'n v. Fuller, 551 So.2d 1210, 1212 (Fla.1989).

III. ANALYSIS

A. Territorial Boundaries
Gulf Coast acknowledges this Court's deferential standard of review of PSC orders, but asserts that the PSC's decision not to establish territorial boundaries in light of the undisputed areas of commingled facilities is unsupported by any evidence and is a departure from the essential requirements of law. Gulf Coast maintains that the PSC has a clear obligation to establish territorial boundaries in this case to prevent further uneconomic duplication and to avoid future territorial disputes.
Gulf Power argues against drawing territorial "lines in the ground" under the circumstances of this case, especially in the absence of a present dispute over service to a particular customer. Gulf Power concedes that there is a commingling of facilities in the developed areas. Gulf Power asserts, however, that this duplication of facilities is not *263 necessarily "uneconomic," and that mere duplication of facilities does not require the PSC to establish a territorial boundary. Gulf Power further maintains that any decision regarding where to set the territorial boundaries in the undeveloped areas would not be in the public interest at this time because of uncertainty over where future development will occur and which company will be able to provide the most cost-effective service to these areas.
We must initially decide whether the PSC was required, as a matter of law, to impose territorial boundaries not agreed to by both parties, where there is no dispute regarding service to current or future identifiable customers. This case differs from others that we have reviewed involving territorial agreements, see, e.g., Ameristeel, 691 So.2d at 473; Fort Pierce Utils. Auth. v. Beard, 626 So.2d 1356 (Fla.1993); Utilities Comm'n of New Smyrna Beach v. Florida Pub. Serv. Comm'n, 469 So.2d 731 (Fla.1985), or territorial disputes regarding service to particular customers where no territorial agreement exists. See, e.g., Clark, 674 So.2d at 120; Lee County Elec. Coop. v. Marks, 501 So.2d 585 (Fla.1987); Gulf Coast Elec. Coop. v. Florida Pub. Serv. Comm'n, 462 So.2d 1092 (Fla. 1985). Here, there is no present dispute as to service to any current or future identifiable customer, no pre-existing territorial agreement, and no agreement on the basic issue of whether a boundary should be imposed, much less where the boundary should be located.
In considering this issue, we note that there is no explicit statutory authority for the PSC to impose territorial boundaries. Instead, the PSC's implicit authority to establish boundaries is derived from two separate jurisdictional provisions: its jurisdiction to approve territorial agreements, subsection 366.04(2)(d), Florida Statutes (1997), and its jurisdiction to resolve territorial disputes, subsection 366.04(2)(e). Subsections (2)(d) and (2)(e) provide:
(2) In the exercise of its jurisdiction, the commission shall have power over electric utilities for the following purposes: ...
(d) To approve territorial agreements between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction. However, nothing in this chapter shall be construed to alter existing territorial agreements as between the parties to such agreements.
(e) To resolve, upon petition of a utility or on its own motion, any territorial dispute involving service areas between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction. In resolving territorial disputes, the commission may consider, but not be limited to the consideration of, the ability of the utilities to expand services within their own capabilities and the nature of the area involved, including population, the degree of urbanization of the area, its proximity to other urban areas, and the present and reasonably foreseeable future requirements of the area for other utility services.
§ 366.04(2)(d), (e), Fla. Stat. (1997) (emphasis supplied).[3] Notably, subsection (2)(e) does not require the PSC to set boundaries in order to resolve a territorial dispute between two utilities.
Another subsection, 366.04(5), vests the PSC with jurisdiction "over the planning, development, and maintenance" of the power grid throughout Florida "to assure an adequate and reliable source of energy," and to avoid "further uneconomic duplication" of facilities. *264 This Court has stated that the PSC is to be guided by this statutory mandate to avoid further uneconomic duplication of facilities in its decisions regarding territorial agreements and territorial disputes. See New Smyrna Beach, 469 So.2d at 732; see also Gainesville-Alachua County Reg'l Elec., Water & Sewer Utils. Bd. v. Clay Elec. Coop., 340 So.2d 1159, 1162 (Fla.1976). However, in the final analysis, the public interest is the ultimate measuring stick to guide the PSC in its decisions. See Beard, 600 So.2d at 453; Lee County, 501 So.2d at 587; New Smyrna Beach, 469 So.2d at 732.
We conclude that the PSC is not required as a matter of law to establish territorial boundaries in order to resolve a territorial dispute that does not involve service to current or future identifiable customers. As the PSC made clear in its order under review, its position is not that it is never appropriate to establish a territorial boundary to resolve a territorial disputejust that it is not in the public interest in this case.
We reject Gulf Coast's argument that the PSC's approval of other territorial agreements establishing territorial boundaries[4] required that the PSC establish territorial boundaries in this case. The PSC's "charge in proceedings concerning territorial agreements is to approve those agreements which ensure the reliability of Florida's energy grid and to prevent needless uneconomic duplication of electric facilities so long as the agreement works `no detriment to the public interest.'" Ameristeel, 691 So.2d at 478. We have also observed that "[t]he legal system favors the settlement of disputes by mutual agreement between the contending parties." New Smyrna Beach, 469 So.2d at 732 (emphasis supplied). This rule applies with "equal force" in territorial agreements. Id. Thus, the issue of whether the PSC should approve a negotiated settlement agreement setting territorial boundaries that does not work a detriment to the public interest differs from whether the PSC is required to establish boundaries in the absence of a territorial agreement.
As to Gulf Coast's argument that the PSC was required to establish territorial boundaries due to the danger of uneconomic duplication, we find that competent substantial evidence supports the PSC's conclusion that even though there is a commingling of facilities in the developed areas, it does not necessarily follow that this duplication is "further uneconomic duplication" within the meaning of subsection 366.04(5) (emphasis supplied). As the PSC observed, the actions of both parties in constructing duplicative facilities have resulted in their ability to serve the same customers in the areas in question.[5] Either utility could serve the areas equally well.
According to testimony presented at the hearing, when service lines are as commingled as they are in these developed areas, the incremental cost to add additional customers is de minimis. One expert testified that it would be nearly impossible for uneconomic duplication to occur in these developed areas in the future because a customer located within that commingled area could be served by either utility without any significant incremental duplication, much less uneconomic duplication.
Regarding the undeveloped areas, competent substantial evidence supports the PSC's decision that a territorial boundary should not be established because it is unclear where future growth will occur. According to testimony at the hearing, establishing fixed boundary lines to determine which company will provide service to future customers does not take into account future load needs and line adequacy, and "totally ignores the differing types of electric loads that might be associated with as yet unknown future development." As the PSC concluded, establishing *265 a fixed boundary for service in these areas would "eliminate the flexibility the utilities need to determine which one is in the most economic position to extend service."
The PSC has determined that requiring the parties to establish guidelines for resolving future service disputes is the better solution in this case[6] and has made clear that it will exercise its jurisdiction to resolve future disputes regarding specific customers on a case-by-case basis. Under these circumstances, the PSC should not be placed in a judicial straight-jacket and forced by this Court to establish territorial boundaries in the absence of an existing dispute over service to current or future identifiable customers. We hold that the PSC has not departed from the essential requirements of law and that its order is supported by competent substantial evidence.

B. Decisional Finality
Before issuing the order that is currently being appealed, the PSC had issued prior orders regarding the disputed territory. These orders indicated the PSC's desire that the two parties reach a territorial agreement. One order provided that if the parties were unable to agree, the PSC would impose boundaries in areas where "further conflict is likely." Gulf Coast argues that the PSC was therefore bound to establish boundaries in light of the prior orders.
The doctrine of decisional finality provides that there must be a "terminal point in every proceeding both administrative and judicial, at which the parties and the public may rely on a decision as being final and dispositive of the rights and issues involved therein." Austin Tupler Trucking, Inc. v. Hawkins, 377 So.2d 679, 681 (Fla.1979). Once a decision has become final for these purposes, it may be modified if there is a significant change in circumstances or a great public interest is served by the modification. See id. However, we have cautioned against a "too doctrinaire" application of the rule. McCaw Communications of Florida, Inc. v. Clark, 679 So.2d 1177, 1179 (Fla.1996) (quoting Peoples Gas System, Inc. v. Mason, 187 So.2d 335, 339 (Fla.1966)).
In this case, we find that the PSC's earlier orders were statements of intent, not "fully litigated" orders "disposing" of the issue. Austin, 377 So.2d at 681. The docket was specifically left open for a future evidentiary hearing to resolve Gulf Coast's petition. As the PSC explained, "the purpose of the hearing was to explore the situation in south Washington and Bay Counties in its entirety" before deciding whether boundaries should be imposed. Both parties had an opportunity to be heard at this hearing and present evidence on their behalf. After considering the evidence, the PSC concluded that territorial boundaries should not be imposed at this time. Under these circumstances, the doctrine of decisional finality does not require a contrary result.
Accordingly, the PSC's decision is hereby affirmed.
It is so ordered.
HARDING, C.J., SHAW and WELLS, JJ., and OVERTON and KOGAN, Senior Justices, concur.
ANSTEAD, J., recused.
NOTES
[1] See In re Petition by Gulf Power Co., Docket No. 930885-EU, Order No. PSC-98-0174-FOF-EU, 1998 WL 101844 (F.P.S.C. January 28, 1998).
[2] As the Court explained in DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957):

We have used the term "competent substantial evidence" advisedly. Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred. We have stated it to be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. In employing the adjective "competent" to modify the word "substantial," we are aware of the familiar rule that in administrative proceedings the formalities in the introduction of testimony common to the courts of justice are not strictly employed. We are of the view, however, that the evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the "substantial" evidence should also be "competent."
(Citations omitted.)
[3] The administrative regulations accompanying subsection 366.04(2)(e) include additional factors to guide the PSC in resolving territorial disputes:

(a) the capability of each utility to provide reliable electric service within the disputed area with its existing facilities and the extent to which additional facilities are needed;
(b) the nature of the disputed area including population and the type of utilities seeking to serve it, and degree of urbanization of the area and its proximity to other urban areas, and the present and reasonably foreseeable future requirements of the area for other utility services;
(c) the cost of each utility to provide distribution and subtransmission facilities to the disputed area presently and in the future; and
(d) customer preference if all other factors are substantially equal.
See Fla. Admin. Code R. 25-6.0441(2) (1998).
[4] See, e.g., Ameristeel Corp. v. Clark, 691 So.2d 473 (Fla.1997); City of Homestead v. Beard, 600 So.2d 450 (Fla.1992); Lee County Elec. Coop. v. Marks, 501 So.2d 585 (Fla.1987); Utilities Comm'n of New Smyrna Beach v. Florida Pub. Serv. Comm'n, 469 So.2d 731, 732 (Fla.1985); In re Joint Petition, 88 F.P.S.C. 6:215 (1988).
[5] According to Gulf Power, the base electric infrastructure of both Gulf Power and Gulf Coast in the commingled areas was already in place when the legislature enacted the statutory provision charging the commission with the prevention of further uneconomic duplication. See ch. 74-19, § 1, Laws of Florida.
[6] The PSC ordered the parties to develop guidelines based on those proposed by Gulf Power, summarized as follows:

(1) neither of the parties shall uneconomically duplicate the other's electric facilities; (2) the parties shall construct or extend [electrical] distribution lines only when necessary to serve a new premises pursuant to a documented request for service from a customer or developer, and shall not construct or distribute lines to serve future speculative growth in the absence of a bona fide request for such construction or extension; (3) neither party shall construct or maintain electric distribution lines to service any premises currently being provided service by the other party; (4) if a party has a distribution line within 1000' of a new premises, that party shall provide service to that premises, if it is capable of doing so; (5) excepting the above provisions, customer preference shall determine which party shall provide service; (6) notification shall be required when one company plans to provide service to a customer for whom the other company could also provide service; (7) mediation is a first resort for resulting disputes; (8) attorney's fees are payable by the losing utility should the parties fail to successfully mediate and be forced to resort to having their dispute solved by the Commission.