# Supreme Court of Florida

_____

No. SC2024-0485

_____

**FLORIDA RISING, INC., et al.,**
Appellants,

vs.

**FLORIDA PUBLIC SERVICE COMMISSION, et al.,**
Appellees.

July 17, 2025

SASSO, J.

This is the second appeal of a determination by the Florida Public Service Commission (Commission) that a multi-party settlement agreement resolving the petition of Florida Power & Light Company (FPL) to establish base rates (Settlement) is in the public interest and results in fair, just, and reasonable rates. We conclude that the Commission properly approved the Settlement and affirm its Final and Supplemental Final Orders.

We first considered the Commission's decision in *Floridians Against Increased Rates, Inc. v. Clark* (*FAIR*), 371 So. 3d 905 (Fla. 2023), where we provided the following background:

> The Commission approved a settlement agreement among FPL and seven parties that intervened in this matter.  The settlement agreement, which took effect in January 2022, permits FPL to increase rates annually for (at least) four years and offer the same rate schedules throughout its service area.  It allows FPL to increase its base rates and service charges such that FPL could generate an additional $692 million in revenue in 2022 and an additional $560 million in revenue in 2023.  It also allows for incremental increases in rates related to the construction of certain solar projects; rates are estimated to increase by $140 million in both 2024 and 2025.  The settlement agreement authorizes an equity-to-debt ratio of 59.6%, and a return on equity (ROE) between 9.7% to 11.7%, with a midpoint of 10.6%.  It further provides that FPL can charge a minimum base bill of $25.00 to residential customers and certain business customers with low energy usage.
>
> The settlement agreement authorizes increased investment in FPL's power generation facilities, transmission and distribution systems, and several pilot programs for electric vehicles (EV) and renewable energy. It includes the expansion of SolarTogether, an additional solar program to the one mentioned above, which allocates newly built solar capacity to different customer classes and allows customers to subscribe to a portion of this capacity in exchange for a credit funded by the general body of ratepayers.  It permits FPL to adopt new depreciation timelines and continue using the Reserve Surplus Amortization Mechanism (RSAM).  Additionally, FPL can adjust rates incrementally if costs change

because of a named tropical system or its successor, like a hurricane, or a permanent change in federal or state corporate tax rates.  And FPL is allowed to share in the savings that result from an expanded version of its asset optimization program.  The settlement agreement also extends, from ten years to twenty, the time over which FPL can recover the cost of certain retired assets.

*Id.* at 907-08 (footnotes omitted).

During the first appeal, the parties presented competing arguments about whether the Commission properly approved the Settlement.  We concluded that the Commission had failed to supply an adequate explanation of its reasoning to afford a basis for meaningful judicial review.  We therefore remanded the Final Order to the Commission for an explanation of the rationale supporting the Commission's conclusion that the Settlement is in the public interest.  *See id.* at 914.  We also directed the Commission to consider the performance of each utility under the Florida Energy Efficiency and Conservation Act (FEECA).  *Id.* at 912.

On remand, Floridians Against Increased Rates (FAIR) moved to reopen the evidentiary record for the limited and sole purpose of admitting the Annual Report of Activities Pursuant to the Florida Energy and Conservation Act for 2021.  The Commission concluded that the FEECA report did not exist in this form until the record in

this proceeding was closed and the Settlement was approved. Accordingly, the Commission found that it would not be appropriate to place documents created post-hearing, post-decision in the record for purposes of making additional findings and denied FAIR's motion.

The Commission next considered its task on remand, concluding that this Court's remand was limited to whether the Settlement should be approved as being in the public interest. The Commission reasoned that this Court neither affirmed nor reversed its conclusion that the Settlement was in the public interest, instead remanding for a further explanation of its approval. And with that limited scope in mind, the Commission issued a Supplemental Final Order on March 25, 2024.

The Supplemental Final Order identifies 15 issues[1] presented by the parties, as well as certain mandatory and discretionary

---

1. The parties raised arguments related to the following parts of the Settlement: (1) need for the rate increases in the settlement agreement; (2) return on equity (ROE) range; (3) equity-to-debt ratio; (4) reserve surplus amortization mechanism (RSAM); (5) rate base investments (SoBRA); (6) pilot programs (electric vehicle chargers, Green Hydrogen, Solar Power Facilities); (7) SolarTogether; (8) minimum bill; (9) extension of time for recovery of retirement costs of certain assets; (10) revenue allocation between

factors for the Commission's consideration when weighing those arguments. Addressing each argument and explaining how the evidence presented informed its analysis, the Commission concluded that the Settlement is in the public interest. It also left intact all aspects of its previously issued orders. Florida Rising, Environmental Confederation of Southwest Florida, and League of United Latin American Citizens of Florida (collectively Florida Rising) appeal that determination, raising three arguments as to why the Commission erred in reaching its conclusion that the Settlement is in the public interest.

## II

### A

Florida Rising's first argument on appeal is that the Commission erred in finding that the expansion of the SolarTogether program[2] satisfies section 366.03, Florida Statutes

---

classes; (11) FPL system overbuilt; (12) storm cost recovery mechanism; (13) federal tax adjustments; (14) incentive mechanism for asset optimization; and (15) solar cap cost incentive.

2. SolarTogether is a rate-based subscription program, where FPL customers pay a flat monthly fee to subscribe to a certain number of kilowatt (kW) of solar panels, then earn savings based on the output of those panels. The Settlement proposed to expand the

(2021), which prohibits public utilities from giving "any undue or unreasonable preference or advantage to any person or locality."

We begin by addressing the standard of review—an issue over which the parties disagree. Florida Rising contends that because its argument on this point depends on the interpretation of the statutory terms "unreasonable" and "undue," it is subject to de novo review. FPL and the Commission contend that the conclusion that SolarTogether's expansion did not result in undue or unreasonable preferences is a factual finding reviewed for competent, substantial evidence. *See Sierra Club v. Brown*, 243 So. 3d 903, 907-08 (Fla. 2018). Contrary to both parties' arguments though, and consistent with our precedent, we conclude that whether the SolarTogether program creates "undue or unreasonable preference or advantage" is neither a purely legal nor a purely factual finding. *See FAIR*, 371 So. 3d at 910.

---

program by an additional 1,788 megawatts (MW) at FPL's discretion through 2025. This expansion would add 24 solar energy centers, bringing the total capacity of SolarTogether to 3,278 MW and more than doubling the program's size. The Settlement proposed to allocate 40 percent of the 1,788 MW of incremental capacity to residential and small business customers and 60 percent to commercial, industrial, and governmental customers.

Our conclusion as to the standard of review is guided by *FAIR*. In that case, we explained that the Commission's power to determine whether a settlement is in the public interest and results in fair, just, and reasonable rates rests on both facts in the record and policy judgments guided by the Commission's "specialized knowledge and expertise in this area." *Id.* (quoting *Gulf Coast Elec. Coop., Inc. v. Johnson*, 727 So. 2d 259, 262 (Fla. 1999)). In making policy judgments, the Commission is afforded a "broad legislative grant of authority." *Id.* (quoting *Citizens of State v. Pub. Serv. Comm'n*, 425 So. 2d 534, 540 (Fla. 1982)). We observed that the Commission's decision "rest[ed] on both facts in the record and policy judgments guided by its 'specialized knowledge and expertise in this area.' " *Id.* (first quoting *Gulf Coast Elec. Coop., Inc.*, 727 So. 2d at 262; then citing *Utils. Operating Co. v. Mayo*, 204 So. 2d 321, 324 (Fla. 1967)). We concluded that our review was therefore limited to ensuring that, first, the Commission's factual findings are supported by competent, substantial evidence and, second, that the Commission's policy decisions are "within the range of discretion given to the Commission by the Legislature." *Id.* at 910-11; *see also* § 120.68(7)(e)1., Fla. Stat. (2021).

Applying *FAIR*'s framework here, we review for competent, substantial evidence any factual findings upon which the Commission's decisions are based. Then, turning to the policy judgment assigned to the Commission in section 366.03, we consider whether the Commission's action results in any "undue" or "unreasonable" preferences. These are qualitative determinations that ultimately rest on the Commission's specialized knowledge. So, as we concluded in *FAIR*, our review is limited to ensuring the Commission acted within the scope of authority granted to it by statute. We accomplish that objective by evaluating whether the Commission articulated a reasoned explanation for its decision, one that includes a rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We may not supply a reasoned basis for the agency's action that the agency itself has not given." (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947))). If it did, we cannot substitute our judgment for that of the Commission.

**B**

Turning to the merits, Florida Rising argues that the SolarTogether expansion creates an undue or unreasonable preference or advantage in violation of section 366.03 because it establishes a rate structure where select ratepayers receive a bill credit paid for by the general body of ratepayers without a benefit to the general body.

Florida Rising's argument on this point is primarily predicated on its conclusion that the general body of ratepayers receives no benefit, ever, from the SolarTogether program. In support of this contention, Florida Rising argues that based on its own calculations, the general body of customers—not the participants—is funding SolarTogether but will not profit from the program. Florida Rising submits the same evidence that it presented to the Commission, arguing that this Court should conclude that SolarTogether is an unduly discriminatory program.

The Commission's factual conclusions regarding the potential benefits of SolarTogether are supported by competent, substantial evidence. The true cost that will be incurred by the general body of ratepayers was a disputed issue of fact during the proceedings

below. Ultimately, the Commission resolved that factual dispute in favor of FPL, relying on the testimony of witness Scott Bores in approving the SolarTogether program. Bores testified about FPL's use of a cost-effectiveness analysis, which showed that the SolarTogether expansion was projected to provide $425 million in cumulative present value of revenue requirements (CPVRR) benefits, for a total of $648 million based on the entire program. Bores' testimony refuted Florida Rising's claim that the expansion would be funded by the general body of customers, as he explained that FPL would recover 103.26 percent of its revenue requirements from the SolarTogether participants.

Likewise, the Commission's conclusion that the general body of ratepayers would benefit from the program expansion was a factual determination supported by the record. Bores testified that the general body of customers will initially contribute toward a portion of the revenue requirements and will be made whole in the latter part of the program as the participants' levelized monthly payment exceeds the declining revenue requirements. Bores also testified about how under the SolarTogether expansion, 55 percent

of the allocated benefits go to participants and 45 percent go to the general body of customers.

We decline Florida Rising's invitation for us to reweigh the evidence submitted to the Commission. *See Ryder Truck Lines, Inc. v. King*, 155 So. 2d 540, 541 (Fla. 1963) ("It would not be proper for this Court to delve into the transcript of the testimony 'in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit.' " (quoting *Florida v. United States*, 282 U.S. 194, 215 (1931))). The Commission's Supplemental Final Order explained that "Bores convincingly demonstrated that the calculations offered by Florida Rising in support of it's claim . . . were based on a flawed assumption." Rejecting Florida Rising's characterization of the data, the Commission found FPL's comprehensive analysis and corresponding conclusion regarding projected benefits to be more persuasive than the "mathematical snapshots" offered by Florida Rising.[3] We will not undermine the Commission's resolution of the

3. For the same reason, to the extent the Commission resolved disputes over certain premises of FPL's projections, including carbon emissions, in favor of the utilities, we conclude

- 11 -

evidentiary dispute even if we would have reached a different conclusion.

The Commission's factual findings aside, Florida Rising argues that SolarTogether results in an undue preference because the select program participants, whose only mark of difference from the general body of ratepayers is that they raise their hand to participate, receive billions of dollars of bill credits from the general body of ratepayers without fully funding the cost of the program.

Importantly though, section 366.03 does not prohibit all "preferences." Utility companies may classify customers into subgroups, and it is within their discretion to treat these groups differently when there is a reasonable basis to do so. *See Fla. Power Corp. v. Mayo*, 203 So. 2d 614, 615 (Fla. 1967) (holding that a petitioner may not effectively attack rates based on discriminatory or arbitrary preference when the utility sufficiently identifies and distinguishes a class of consumers). In fact, the very rate structure of a utility is "the classification system used in justifying different rates." *Lewis v. Pub. Serv. Comm'n*, 463 So. 2d 227, 229 (Fla. 1985)

---

that information would have been in the Commission's discretion to consider even if highly speculative.

(quoting *City of Tallahassee v. Mann*, 411 So. 2d 162, 163 (Fla. 1981)). So, section 366.03 prohibits only those preferences that make or give any undue or unreasonable preference or advantage to a person or locality. In evaluating what types of preferences are "undue" or "unreasonable," this Court has long recognized that the Commission "has considerable discretion and latitude in the rate-fixing process." *Gulf Power Co. v. Bevis*, 296 So. 2d 482, 487 (Fla. 1974); *see also City of Miami v. Fla. Pub. Serv. Comm'n*, 208 So. 2d 249, 253 (Fla. 1968). And as we explained already, our review of this determination is limited to ensuring the Commission acted within its discretion. We do that by examining the Commission's stated reason for its decision and evaluating whether there is a rational connection between the facts found and the choice made. *See FAIR*, 371 So. 3d at 914 ("[T]he Commission must show that its decision results from the application of its 'specialized knowledge and expertise' to the facts here." (quoting *Gulf Coast Elec. Coop., Inc.*, 727 So. 2d at 262)).

Turning to the Commission's reasoning, the Commission recognized Florida Rising's argument that the program's benefits to participants are subsidized by the general body of ratepayers but

- 13 -

nonetheless concluded that the SolarTogether expansion is in the public interest. This is so, says the Commission, based on the projected benefits of the solar power plants, including furthering the Legislature's stated policy goal of promoting the development of renewable energy resources in the state. The Commission further concluded that the proposed rate structure fairly distributes benefits among ratepayers.

Certainly, reasonable minds can disagree when reaching a prudential policy judgment after considering the competing interests presented by the SolarTogether program. The Commission's staff analysis, for example, concludes that the rates may be "unduly" discriminatory given the allocation of risk to the general body of ratepayers. But in assessing competing policy concerns the Commission plainly acts within the discretion it is given by statute, and we defer to its exercise of the discretion in making policy. The Commission's determination that the SolarTogether expansion does not result in undue or unreasonable preference or advantage rests on its explanation of the projected benefits to all ratepayers of the development of renewable energy resources in the state. The Commission's approval of the allocation

of benefits is rationally based on its conclusion that program participants bear the majority of the program costs. The Commission also determined that the overall program increases the availability of new solar generation for residential and small business customers and increases development of renewable energy in the state. This determination was not arbitrary, even in the face of available alternative methods of meeting solar generation needs.[4]

---

4. While Florida Rising argues there are alternative forms of solar generation that would result in a more equitable rate structure, the cost-effectiveness of the SolarTogether program is a factual finding to which we defer if there is competent, substantial evidence to support the determination. *See Fla. Indus. Power Users Grp. v. Brown,* 273 So. 3d 926, 932 (Fla. 2019). Here, there is competent, substantial evidence to support the Commission's finding because it rejected Florida Rising's arguments in favor of Scott Bores' testimony on this point. Likewise, our dissenting colleague views the relevant question as one of whether the SolarTogether program's preferential rate structure is a reasonable way to pursue additional solar generation. In our view, the answer to this question is a policy determination to which we defer to the Commission. While the record supports a conclusion that, traditionally, voluntary tariffs have been offered when the service desired was not cost competitive with traditional generation, we do not believe the Commission's policy determination is confined to a single-factor, least-cost planning analysis. Instead, we conclude that the Commission's policy decision to permit a rate structure that is preferential to SolarTogether participants depends on a variety of competing policy concerns including incentivizing the statewide adoption and promulgation of alternative energy and a grid to produce it.

Because the Commission's stated reasoning is factually supported by the record and its rationale is not arbitrary, this Court will not substitute its judgment on those issues.

### III

Florida Rising next argues that individual components of the Settlement, such as the ROE, the equity-to-debt ratio, the RSAM, the extensive base rate additions, system overbuilding, the extension of asset recovery time, incentive mechanisms, pilot programs, revenue allocation between customer classes, and the inclusion of a minimum bill, are not in the public interest. Florida Rising therefore argues that the Commission erred in approving the Settlement as within the public's interest.

When the Commission approves a settlement agreement, our review is again limited to ensuring the Commission's factual findings are supported by competent, substantial evidence, and the Commission's policy determinations are within the range of discretion given to the Commission by the Legislature. In doing so, we have explained that the Commission need not "resolve every issue independently" in its final order when it is reviewing a settlement agreement. *Sierra Club*, 243 So. 3d at 914 (citing

*Citizens of State v. Fla. Pub. Serv. Comm'n,* 146 So. 3d 1143, 1153 (Fla. 2014)); *see also id.* at 911 ("We have specifically approved the Commission's practice of reviewing settlements as a whole for the public interest and rejected the notion that the Commission must address each individual issue in the underlying rate case . . . ."). Even so, the Commission must nonetheless "discuss[] the major elements of the settlement agreement and explain[] why it [is] in the public interest." *Id.* at 914. Further, and as we explained in *FAIR,* a reasoned explanation from the Commission should demonstrate that the Commission considered the mandatory and discretionary statutory factors, along with nonstatutory factors if appropriate, bearing on whether a settlement agreement is in the public interest and results in rates that are fair, just, and reasonable. *See FAIR,* 371 So. 3d at 912-13 (delineating mandatory and discretionary statutory factors).

The Commission's factual findings on this score were supported by competent, substantial evidence. Florida Rising argues that the Commission's order is deficient in its policy determinations because it failed to acknowledge or discuss the interaction between the ROE, the equity ratio, and the RSAM; the

order is, according to Florida Rising, not in the public interest.[5]

But contrary to that argument, the Commission did consider the interaction between the ROE, the equity-to-debt ratio, and the RSAM in determining that the Settlement as a whole is in the public interest.

In the Supplemental Final Order, the Commission first analyzed "FPL's capital structure," which is made up of the ROE, the equity ratio, and the RSAM. The Commission observed that "approval of a regulatory ROE of 10.6 percent for all purposes, with an authorized ROE range of 9.7 percent to 11.7 percent, and equity ratio of 59.6 percent . . . will ensure that FPL has adequate and timely access to capital in order to continue supplying reliable service." The Commission further concluded that it disagreed with the conclusions of the intervenors' witnesses that "FPL would enjoy the same or similar access to capital with a lower ROE and

---

5. To the extent that Florida Rising contends that individual components of the Settlement were not in the public interest, the Commission did not err in not making these findings. *Sierra Club*, 243 So. 3d at 913. This Court has "expressly rejected the argument that a Commission final order can be insufficient for failing to resolve every issue independently and explain why it overruled a party's objection to a settlement." *Id.* at 914 (citing *Citizens of State*, 146 So. 3d at 1153).

restructured equity to debt ratio." Accordingly, the Commission did consider the ROE and equity ratio and found FPL's experts' opinions supporting the capital structure to be more persuasive.

The Commission also found that the RSAM, which is "designed to support a four-year rate plan," supports this overall capital structure. The Commission further concluded that the RSAM provides FPL with a mechanism for addressing unexpected expense and revenue impacts without seeking a rate increase. The Commission concluded that "[w]ithout the RSAM, the multiyear rate plan would not be possible, and ratepayers would not enjoy long-term bill stability." This analysis demonstrates that the Commission also considered how the RSAM can better achieve economic stability.

Finally, we reject Florida Rising's argument that the Commission erred in determining the Settlement was within the public interest. Before reaching its public interest determination, the Commission explained its decision under the mandatory, discretionary, and case-specific factors. For example, the Commission began with its analysis of FPL's capital structure, concluding that the ROE and equity-to-debt ratio ensured that "FPL

has adequate and timely access to capital in order to continue supplying reliable service." The Commission also explained that the RSAM "provides FPL with a tool to address unexpected expense and revenue impacts over the Settlement Term without the need to seek a rate increase." The Commission further concluded that "[w]ithout the RSAM, the multiyear rate plan would not be possible, and ratepayers would not enjoy long-term bill stability." The Commission then explained why other Settlement mechanisms contribute to FPL's financial ability to operate under a multiyear rate plan.

The Commission also analyzed case-specific factors, concluding that the use of the SoBRA mechanism, SolarTogether, and the pilot solar power program is consistent with the Legislature's pronouncement "that it is in the public interest to promote the development of renewable energy resources in this state." § 366.91(1), Fla. Stat. (2021).

After discussing the major elements of the Settlement, the Commission concluded that it was in the public interest and established rates that are fair, just, and reasonable, stating:

The preponderance of the evidence in this record demonstrates that the 2021 Settlement Agreement supports a multi-year rate plan, which in turn benefits customers and serves the public interest by providing long-term stability and predictability with respect to base rates. FPL is bringing an appreciable amount of renewable energy online with the SoBRA mechanism and Phase II of SolarTogether, and has proposed additional programs to promote the development of future renewable energy resources consistent with legislative direction. FPL has built a system that consistently ranks near the top nationally for reliability. FPL residential customer rates remain among the lowest in the state and nation.

Following review, we conclude that the record supports the Commission's determination and that it acted within its discretion. There is no basis for this Court to vacate the Supplemental Final Order based on the public interest finding.

**IV**

In *FAIR*, this Court directed the Commission to "consider the performance of each utility pursuant to [FEECA] when establishing rates for those utilities over which the commission has ratesetting authority." 371 So. 3d at 912 (quoting § 366.82(10), Fla. Stat. (2021)). This Court concluded that a "reasonably explained decision from the Commission" must reflect that FEECA was considered "to the extent practicable." *Id.* With its next argument,

Florida Rising argues that the Commission did not sufficiently address FPL's FEECA performance in its Supplemental Final Order.

Contrary to Florida Rising's argument, the Commission addressed FPL's FEECA performance in its Supplemental Final Order as part of its public interest determination. The Commission concluded that demand-side management (DSM) goals and plans are generally not subject to reexamination in a base rate case. The Commission found that mostly, Florida Rising's arguments would be more appropriately raised in FPL's 2024 goal setting, DSM plan, and the annual energy conservation cost recovery clause dockets. At the same time, the Commission concluded that FEECA influenced some of the analysis in base rate cases. The Commission found that FPL properly accounted for incremental DSM in its load forecasts. The Commission also concluded that FPL's resource analyses in this case followed and were consistent with the Commission's conservation goals. The Commission properly evaluated FPL's FEECA performance as part of its public interest determination. *See id.* (providing that a utility's FEECA performance is one of two mandatory factors that the Commission must consider in its review of a settlement agreement). Based on

section 366.82(10), this Court required that the Commission consider the "performance" of FPL under FEECA when establishing rates.

Here, the Supplemental Final Order explained that the Commission had considered FPL's resource analyses and found that they were consistent with the established goals. This Court has no reason to question what the Commission said in its order, as we are limited to ensuring that the Commission's decision is within the range of discretion. *Id.* at 910-11. The Commission's review satisfies this Court's request to consider FEECA "to the extent practicable." *Id.* at 912. The Commission concluded that the Settlement is consistent with FEECA, is in the public interest, and establishes fair, just, and reasonable rates.

**V**

We affirm the Commission's Final and Supplemental Final Orders.

It is so ordered.

LABARGA, COURIEL, and GROSSHANS, JJ., concur.
CANADY, J., concurs in result.
FRANCIS, J., concurs in result with an opinion, in which
CANADY, J., concurs.
MUÑIZ, C.J., dissents with an opinion.

- 23 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

FRANCIS, J., concurring in result.

I continue to adhere to the concerns raised in my dissent in *FAIR*.  For now, though, it is sufficient to me that the majority affirms the Commission's determination—which is supported by competent, substantial evidence—that the settlement "provides a reasonable resolution of all issues raised, establishes rates that are fair, just, and reasonable, and is in the public interest."  371 So. 3d at 909 (quoting the Commission's order).

CANADY, J., concurs.

MUÑIZ, C.J., dissenting.

As the majority seems to concede, the SolarTogether program establishes rates that are preferential to program participants.  The rates are preferential because it is undisputed that participants over the life of the program will receive billions more in credits—paid for by the general body of ratepayers—than the participants pay in subscription fees.  The question for the Commission was whether this preference is "undue or unreasonable," contrary to the prohibition in section 366.03, Florida Statutes (2021).

- 24 -

The majority rightly identifies that question as involving the application of the Commission's policy expertise and delegated discretion to the facts that the Commission found. As the majority explains, our Court must review the Commission's exercise of discretion by "examining the Commission's stated reason for its decision and evaluating whether there is a rational connection between the facts found and the choice made."

As best I can tell, the only factual finding underlying the Commission's decision is that the SolarTogether program is "cost effective," in the sense that building more solar capacity will save money relative to an alternative where the same amount of new energy is generated without solar. I take no issue with the majority's conclusion that the record is sufficient to support that finding. As for policy discretion, the Commission leans heavily on the Legislature's statutory goal of promoting renewable energy development in Florida. That, too, is fine as far as it goes.

The problem is that the Commission's findings and reasoning are plainly inadequate to sustain the SolarTogether program's preferential rate structure. If the rate structure is preferential, it raises a factual question about the connection between that

structure and achieving the desired increase in solar capacity. The policy question would then be whether the overall benefits (including any policy benefits) are "due" and "reasonable." In other words, given the way the parties have litigated this case, the relevant factual question is not whether building more solar capacity will save money, and the relevant policy question is not whether more solar is consistent with the Legislature's policy goals. Instead, the relevant questions revolve around whether the record supports using a preferential rate structure to pursue those goals.

The record evidence is unrebutted that the general body of ratepayers would save $2 billion if the company were to build the same amount of new solar capacity but pay for it in a non-preferential way. Witness Scott Bores—the key witness whom the majority relies on when evaluating the Commission's decision—admitted this. When asked "if there were no subscription credits and there were no subscription revenues, wouldn't the benefits to the general body of customers be increased . . . by a little over $2 billion?" Bores confirmed, "Commissioners, that's – that's not the program here before you." And when again pressed, "[A]ren't [the program participants] expected to receive everything that they pay

back plus an additional $2 billion?" Bores admitted, "On a nominal basis, yes . . . ." Witness Matthew Valle, an FPL witness, also admitted this fact. When asked "if there were no subscription credits and no subscription revenues, isn't it true that the . . . benefits to the general body of ratepayers . . . would be expected to increase by more than $2 billion?" Valle responded: "[I]f there was no program and we built the solar, it's true, the general body of customers would pay for a hundred percent of the cost of the solar facilities—facilities and they would receive a hundred percent of the benefits. That's not this program."

It is conceivable that facts could be developed that would justify paying for the new solar capacity the way SolarTogether does, but there is no such evidence in the record. It is not enough just to point to the projected benefits of new solar, because the parties' dispute is over how to pay for the new solar capacity, not whether to pursue it at all. No facts in the record support a conclusion that it is "due" or "reasonable" to transfer $2 billion from the general body of ratepayers to SolarTogether program participants. The Commission found no facts, and it supplied no reasoning, to justify the program's preferential rate structure.

For these reasons, I would set aside the order under review, on the ground that the Commission has acted "outside the range of discretion delegated to [it] by law." § 120.68(7)(e)1., Fla. Stat. (2021).

An Appeal from the Florida Public Service Commission

Bradley Marshall and Jordan Luebkemann of Earthjustice, Tallahassee, Florida,

>   for Appellants Florida Rising, League of United Latin American Citizens, and Environmental Confederation of Southwest Florida

John T. Burnett, Maria Jose Moncada, and Joel Baker of Florida Power & Light Company, Juno Beach, Florida; and Daniel Nordby, Alyssa L. Cory, and Elise Engle of Shutts & Bowen LLP, Tallahassee, Florida,

>   for Appellee Florida Power & Light Company

Keith C. Hetrick, General Counsel, Samantha M. Cibula, Attorney Supervisor, Susan Sapoznikoff, Senior Attorney, Caroline G. Dike, Senior Attorney, and Douglas D. Sunshine, Senior Attorney, Florida Public Service Commission, Tallahassee, Florida,

>   for Appellee Florida Public Service Commission